REYNOLD DAVIS, EMPLOYEE-PLAINTIFF v. EDGECOMB METALS COMPANY, EMPLOYER, AND CRAWFORD AND COMPANY, CARRIER-DEFENDANTS

No. 8210IC662

(Filed 5 July 1983)

**Master and Servant § 66— workers' compensation—leg injury—additional compensation for mental condition**

> The uncontroverted evidence supported findings by the Industrial Commission that plaintiff received compensation for a leg injury sustained by accident arising out of and in the course of employment with defendant employer and that plaintiff subsequently suffered a disabling post-traumatic neurosis with a depressive reaction, first caused by the accident itself, and followed by a regression from his improved mental condition when he was told that his leg would be permanently shorter. These findings supported the Commission's conclusion that plaintiff was entitled to additional compensation for temporary total disability as a result of this neurosis until he reached maximum improvement from such condition, notwithstanding plaintiff's leg injury was a "scheduled injury" under G.S. 97-31(15).

APPEAL by defendants from opinion and award of the North Carolina Industrial Commission filed 8 April 1982. Heard in the Court of Appeals 10 May 1983.

Plaintiff received compensation for a leg injury sustained on 28 November 1979 by accident arising out of and in the course of his employment with defendant employer. The Commission found that he subsequently suffered a disabling post-traumatic neurosis with a depressive reaction, first caused by the accident itself, and followed by a regression from the state of improvement he had achieved in his depression, which regression occurred when he was told that his leg would be permanently shorter. It concluded that he was entitled to additional compensation until he reached maximum improvement from the psychiatric condition, and entered an award accordingly.

Defendants appeal.

*No brief filed for plaintiff appellee.*

*Smith, Moore, Smith, Schell & Hunter, by J. Donald Cowan, Jr., and Caroline Hudson, for defendant appellants.*

WHICHARD, Judge.

"In appeals from the Commission, the scope of our review under the Workers' Compensation Act is (1) to determine if the Commission's findings of fact are supported by competent evidence in the record, and (2) to determine if the findings of fact reasonably support the conclusions of law." *Chandler v. Teer Co.*, 53 N.C. App. 766, 768, 281 S.E. 2d 718, 719 (1981), *aff'd*, 305 N.C. 292, 287 S.E. 2d 890 (1982) (per curiam). We find ample competent evidence to support the contested findings, and hold that these findings reasonably support the conclusions of law. We thus affirm the award.

The parties stipulated that plaintiff was compensated for his initial injury and the permanent disability to his leg which resulted from it. The findings to which defendant excepts are:

6. Plaintiff has suffered a post-traumatic neurosis with a depressive reaction, as a result first of the accident itself after which he has suffered dreams and flashbacks of the recurrence of the injury and then secondly, when he was rated in October of 1980 and told that that was the best he was going to get and that his leg would be permanently shorter, he suffered a regression from his state of improvement he had achieved in his depression. [Emphasis omitted.]

Plaintiff has been and remains temporarily totally disabled as a result of this neurosis, which is directly caused by plaintiff's accident and the residual disability therefrom.

7. Plaintiff has not been able to work since the injury with the exception of some few days when he worked with a cousin as a housepainter but found that he could not concentrate, felt that his medicine made him act like a zombie, and on the third day he asked his cousin to take him home.

8. Plaintiff is in need of further psychiatric care, either under the care of Dr. Dovenmuehle if that is the doctor's recommendation or with a local mental health clinic if that is the doctor's recommendation in order to achieve maximum improvement and hopefully have no permanent disability as a result of the psychiatric problems.

The evidence which supports these findings, in some detail, is as follows:

A medical expert specializing in psychiatry testified that he commenced treating plaintiff in July 1980, and that except for a brief period plaintiff had been under his care consistently since that date. When the witness initially saw plaintiff, plaintiff was suffering a great deal of anxiety. He had "poor sleep interrupted by nightmares which were involved with the accident that he had." During the day he had flashbacks when he momentarily visualized himself again being hit by the load of steel that crushed his leg. Sometimes he would visualize more extensive damage than occurred, such as bars of steel "falling and cutting through his body and just chopping him into sections."

Plaintiff at that time had "startled reactions." He was mildly depressed, his concentration was very poor, his recent memory "particularly was poor," and he was irritable with his family. All of this "is typical of the post-traumatic stress reaction which had gone on for some time at that point."

By October plaintiff had attained considerable improvement in his mental condition. He was then informed that his leg would not completely recover, that he would not have the full use or length of it, and that he would need to wear a lift in his shoe. He also had continual pain and swelling in the leg throughout the period the witness treated him, though this was not "a major part of the psychological picture."

When plaintiff learned that his leg would be permanently shorter as a result of the accident, "the very serious depression started in." Throughout the summer of 1980 plaintiff's deficiency in concentration and memory was "so poor that there was no question in [the witness'] mind that he would be unable to hold a job, any kind of job, simply because of the psychological factors involved."

From the initial period of treatment until "near Christmas" plaintiff did fairly well at following the witness' recommendations, particularly regarding his studies at a technical institute. His behavior then became characteristic of severe depression, however. He became much more pessimistic, began to have suicidal thoughts, and "felt without energy." He had to force himself to study, and eventually started dropping courses. He became so suicidal that the witness eventually insisted on hospitalizing him.

At this point plaintiff was "just totally fixed on his worthlessness and the hopelessness of his condition." He "just kept going downhill with the depression," and increases and changes in his medication "did not handle it."

The witness testified that "[p]sychiatrically [plaintiff was] unusually focused on his body as an instrument of his self esteem." He had "always been kind of a super athlete" and had "always maintained [a] belief in his physical power and invulnerability." The witness knew of no evidence of neurotic behavior or character disorder in plaintiff pre-dating the accident, however.

Plaintiff eventually agreed to go to a psychiatric hospital, where he spent six weeks. He was treated there with potent antipsychotic drugs which "rendered him in effect a zombie." His thinking was substantially slowed, and following his release from the hospital he was withdrawn from the drugs, but that only made him more depressed. He was put back on the drugs and had an improved drug reaction, but was still "a long way from being well in terms of the depression." He had tried to work with a friend or relative, but would only last about half a day. The witness had discussed with plaintiff the possibility of rehospitalization, because plaintiff still had suicidal thoughts quite frequently.

As to the cause of plaintiff's psychiatric illness, the witness testified:

> I have seen [plaintiff] now 36 times and there is no question in my mind at all but that all the psychological problems are the proximal result of that accident. The psychological problems started with a severe post-traumatic stress reaction. That this was connected to the accident was very clear in terms of the flashbacks that he was getting of the accident, the nightmares he was having in terms of his body being dismembered by falling steel, and so on. There is no question about that post-traumatic stress reaction being the direct proximal result of that accident on November 28, 1979.
>
> As far as the depression is concerned, this has to do with the damage, the permanent damage to his body. . . . [T]he severity of the psychological insult here does not have to be

equivalent to the physical insult to the body. . . . [H]e only has a three-quarter inch shortening of his leg. I think with one part of himself he knows that that leg is perfectly good to walk on and so on. He cannot play football any more without getting severe pain and swelling, but the psychological insult to him because of that deformation of the leg was just totally devastating because it undercut the prime support for his self esteem which was physical power and invulnerability.

On cross-examination the witness testified that plaintiff's problems "centered primarily on his ability to recognize and accept the extent of the disability to his leg rather than any actual problems he ha[d] been experiencing physically with his leg"; that plaintiff's "psychological problems and depression . . . became more acute when he found out that his leg was not going to get better and would be shorter the rest of his life"; and that "this was the inability of [plaintiff] to accept the permanent injury to his leg psychologically more than the actual permanent injury itself." He stated:

It would be fair to say that the only reason [plaintiff] is not working now is due to his depressive post-traumatic neurosis, based on the factors that I described earlier, that is the anxiety, nightmares, flashbacks, poor memory, and severe depression. That is the main and only reason he is not working now. I would presume that physically he is able to work, but that is outside my field. Psychologically, . . . in my opinion he is not able to work. He tried, I believe it was last month, and did not last more than a couple or three days.

. . . .

I indicated that [plaintiff] knew that his leg was good to walk on but that he could not accept permanent damage to his body. . . . [H]e cannot accept as a person that a part of his body has been damaged. That is one of the primary causes of depression I described earlier. I want to emphasize again that his self esteem, his feeling of worth about himself centered on the intact physical body, powerful and invulnerable to injury . . . .

. . . The depressive reaction that I described is based not so much on an inability to accept that permanent rating

to his leg as that it produces a total destruction of the base for his self esteem. That is why the depression is so severe and hanging on so long.

In letters to plaintiff's attorney, which were introduced as exhibits for plaintiff, this medical witness stated the following:

At the same time the phobic aspect of plaintiff's condition improved, his depression became more severe. The worsening depression coincided with plaintiff's learning that he would always have "some shortening" of the injured leg. Plaintiff was "totally unable to accept this," and ultimately his depression and agitation made hospitalization mandatory.

Plaintiff suffered "a post-traumatic neurosis with a depressive reaction, at times of psychotic proportions, directly caused by the accident." He has "a typical traumatic neurosis with some phobic qualities." The neurosis is quite severe and has resulted in considerable depression. There is "no evidence of malingering or secondary gain from this disability."

Plaintiff testified that prior to the accident he had not had any emotional or psychological problems. He had been quite athletic, had majored in physical education and played football while in college, and had remained physically active after college.

The injury had impacted upon his day-to-day lifestyle. On a rainy day he had constant pain in the injured leg. He was no longer able to participate in sports with his seven year old son. Neither he nor the son could understand or accept this, and it bothered him a great deal.

Plaintiff was afraid to go out of his house, and afraid to ride with his wife when she was driving. He feared passing a truck with a load of steel on it, and would get off the highway to avoid it.

"[E]verything just went haywire" when the doctor told him "about the leg and what was to be expected with the pain and the swelling." He could not accept the fact that he had been in a mental hospital and could not work out his own problems. He got nervous and upset, could hardly drive a car, and "couldn't do anything." He stated that "[t]o get away from it all [he] primarily [slept]."

Plaintiff's wife testified as follows:

She had observed plaintiff go "from a very independent, very competent, very outspoken person to someone who has no motivation at all." He is very withdrawn, and much of the time "just does not want to be bothered." He no longer watches or attends sports events, because he cannot participate. He no longer wants to participate in family events. In her opinion plaintiff "just gave up" when he was told that his leg was permanently injured and that "it was just going to be that way."

The foregoing evidence clearly supports the finding that plaintiff's post-traumatic neurosis with depressive reaction resulted initially from the accident itself. It establishes that plaintiff experienced the described mental condition prior to learning that his leg would be permanently shorter, and, although he had improved from his initial state of depression, he regressed severely when he learned of the permanent nature of his condition. The medical witness testified clearly and repeatedly that plaintiff's mental condition was the proximate result of his industrial accident, and that this condition alone rendered him unable to work. The findings in question thus are amply supported by competent evidence and are therefore conclusive on appeal. *Hollman v. City of Raleigh*, 273 N.C. 240, 245, 159 S.E. 2d 874, 877 (1968).

The question becomes, then, whether these findings support the conclusion of law that plaintiff is entitled to additional compensation until "under appropriate care [he] reaches maximum improvement from the psychiatric condition." Defendants contend that plaintiff's leg injury is a "scheduled injury" under G.S. 97-31 (15) (1979); that the compensation he received for that injury is, by provision of that statute, "in lieu of all other compensation"; and that the Commission therefore erred in awarding additional compensation for a disabling psychiatric condition which resulted from plaintiff's inability to accept the permanency of the injury to his leg. We hold that the Commission correctly applied the pertinent law to its findings.

. . . [W]hen there has been a physical accident or trauma, and claimant's disability is increased or prolonged by traumatic neurosis, conversion hysteria, or hysterical paralysis, it is now uniformly held that the full disability including the effects of the neurosis is compensable. Dozens of

cases, involving almost every conceivable kind of neurotic, psychotic, depressive, or hysterical symptom, functional overlay, or personality disorder, have accepted this rule. . . .

There is almost no limit to the variety of disabling "psychic" conditions that have already been recognized as legitimately compensable . . . .

. . . .

As in other connections, a preexisting weakness in the form of a neurotic tendency does not lessen the compensability of an injury which precipitates a disabling neurosis. . . .

. . . .

When the physical injury precipitating the neurosis is itself a schedule injury, no special problems arise, since the case falls easily within the familiar rule that the schedule is not exclusive when the effects overflow beyond the scheduled member. . . .

. . . .

. . . [C]ases denying compensation will usually be found to have done so not on the theory that traumatic neurosis is not compensable as such, but on the ground either that the evidence failed to establish a causal connection between the injury and the neurosis, or that there was no neurosis or disability.

1B A. Larson, *Workmen's Compensation Law* § 42.22, at 7-597 to -622 (footnotes omitted).

The great majority of modern decisions agree that, if the effects of the loss of the member extend to other parts of the body and interfere with their efficiency, the schedule allowance for the lost member is not exclusive. . . . An increasingly common application of this rule involves schedule-type injuries that produce mental and nervous injury, such as traumatic neurosis; these have generally been found to call for awards going beyond the schedule.

2 *Id.* at § 58.21, at 10-222 to -243 (footnotes omitted).

The following cases from other jurisdictions, because of their similarity to this case, merit mention:

In *LaCalle v. Ashy Enterprises*, 353 So. 2d 439 (La. Ct. App. 1977), *cert. denied*, 355 So. 2d 266 (1978), plaintiff broke his leg in an industrial accident and received compensation for the resulting disability. The treating physician discharged plaintiff as able to return to work with a six percent permanent disability of the leg. A psychiatrist subsequently found him disabled as a result of a severe anxiety-depressive neurosis precipitated by the leg injury. The court upheld an award for total and permanent disability.

In *Fruehauf Corp. v. Prater*, 360 So. 2d 999 (Ala. Civ. App. 1978), *cert. denied*, 360 So. 2d 1003 (1978), plaintiff, a furnace operator in defendant's plant, sustained burns over fifty-five percent of his body. His recovered physical condition was such that he had a five percent disability of the body as a whole. The trial court found permanent disability, *inter alia*, because of the psychiatric consequences of his injury, *viz.*, a depressive neurosis.

The appellate court upheld the award. It stated:

Depressive Neurosis is defined as "a severe onset of depression due to internal conflict or the loss of an object real or symbolic. It is characterized by morbid sadness, dejection, or melancholy and usually is accompanied by loss of sleep, loss of interest in activities, weariness, inhibitions, and loss of appetite and weight. This reaction is commonly seen in neuroses following trauma."

*Id.* at 1000-01.

The court recognized the difficulty of establishing the existence or the precipitating cause of any neurosis or psychic disorder, as well as the "distinct possibility of attempted malingering in the absence of objective symptoms." *Id.* at 1001. It believed, though, that the difficulty of proof could be "overcome by use of expert medical testimony and/or objective evidence." *Id.* It also believed that "malingering [could] be minimized by the vigilance of a discerning trial judge." *Id.*

This Court has held in general accord with the foregoing authorities. In *Fayne v. Fieldcrest Mills, Inc.*, 54 N.C. App. 144, 282 S.E. 2d 539 (1981), *disc. rev. denied*, 304 N.C. 725, 288 S.E. 2d 380 (1982), it held that a plaintiff who had received compensation for a back injury, and who subsequently suffered a disabling neurotic depressive reaction, which medical evidence indicated

was directly related to and caused by the back injury, was entitled to additional compensation for the disabling mental condition. A subsequent case described the *Fayne* holding as "that if an employee receives an injury which is compensable and the injury causes her to become so emotionally disturbed that she is unable to work, she is entitled to compensation." *Barnes v. O'Berry Center*, 55 N.C. App. 244, 246, 284 S.E. 2d 716, 717 (1981).

In *Gamble v. Borden, Inc.*, 45 N.C. App. 506, 263 S.E. 2d 280 (1980), *disc. rev. denied*, 300 N.C. 372, 267 S.E. 2d 675 (1980), plaintiff had received compensation for head and back injuries. The Court held that he was entitled to additional compensation for permanent disability from "post-traumatic syndrome, traumatic neurosis, as a result of the injury."

Defendants cite no authority contrary to the foregoing. They attempt to distinguish the opinions of this Court discussed above, as well as other cases from this jurisdiction, but we find the asserted distinctions unavailing.

The principal thrust of defendants' argument is that plaintiff's disability was caused by his idiosyncratic reaction to the permanency of his condition rather than by the injury itself. The uncontroverted evidence, however, fully supports the Commission's finding as to the primacy of the accident itself as a causative factor. The medical witness testified that there was no evidence that plaintiff had exhibited neurotic behavior or character disorder pre-dating the accident. He further testified that plaintiff's psychological problems started with a severe post-traumatic stress reaction, and that it was clear that this was connected to the accident and was the direct proximal result of it. The witness' letter stated that plaintiff suffered "a post-traumatic neurosis with a depressive reaction, at times of psychotic proportions, *directly caused by the accident*." (Emphasis supplied.)

In sum, the uncontroverted evidence establishes that plaintiff's psychotic condition was directly caused by the accident itself, and that it pre-dated his learning of the permanency of the condition of his leg. That plaintiff's perhaps idiosyncratic reaction to the permanency of his original injury may have caused a regression of his mental condition, and may have been the ultimate factor which acted on the condition itself to render it severe and disabling, is not determinative of his entitlement to

*additional compensation.* The determinative factors are the primacy of the condition itself, and its causal connection with the accident. These were well established by uncontroverted evidence.

We thus hold, pursuant to the authorities cited above, that the Commission's findings fully justified its conclusions and award of compensation. To hold otherwise would be discordant both with the foregoing authorities and with the well-established principle that "[t]he worker's compensation act should be liberally construed to effectuate its purpose to provide compensation for injured employees . . . [,] and its benefits should not be denied by a technical, narrow, and strict construction." *Pennington v. Flame Refractories, Inc.,* 53 N.C. App. 584, 588, 281 S.E. 2d 463, 466 (1981).

Affirmed.

Judges WEBB and BRASWELL concur.