[No. B.A. 1.   En Banc.   November 1, 1984.]

*In the Matter of* DENNIS BELSHER.

Dore, J.—Petitioner, Dennis Belsher, seeks admission to the bar association of the state of Washington. His application comes before this court for a determination of his moral fitness to practice law. We deny his application.

I

On March 12, 1973, in Boulder, Colorado, petitioner placed a homemade bomb in his parents' car. The bomb consisted of several sticks of dynamite and a timing device. The timing device was activated that same day, causing an explosion which demolished the Belshers' car. Belsher's mother and father, however, escaped injury by leaving the car a few seconds before the explosion.

Petitioner was arrested and admitted responsibility for

the explosion. After a psychiatric examination by Dr. Charles Clark, petitioner was found to be competent to stand trial. On March 14, 1973, he was charged with two counts of attempted first degree murder and one count of first degree arson. A joint motion for deferred prosecution with 2 years' supervised probation on the condition that petitioner undergo continuing psychiatric treatment was granted on November 26, 1973. Dr. Clark was selected as the treating psychiatrist.

In March 1974, it was discovered that petitioner had been manufacturing an illegal drug ingredient (amphetamine precursor) in his chemistry lab at the University of Colorado. He advised Dr. Clark that he was doing so in order to become an undercover agent for the Alcohol, Tobacco and Firearms Division of the Internal Revenue Service. About this same time, petitioner also attempted to purchase two pistols, using a friend's name. As a result of these incidents, petitioner was charged with attempt to manufacture dangerous drugs, conspiracy to manufacture dangerous drugs, and criminal impersonation. In addition, petitioner's deferred prosecution was revoked.

Pursuant to plea bargain arrangements, petitioner pleaded guilty on May 16, 1974 to three reduced charges: third degree assault, possession of a dangerous drug, and criminal simulation. All other charges, including those stemming from the bombing incident, were dismissed. Petitioner was placed on supervised probation to run until May 16, 1979. One of the conditions of the probation was that petitioner continue to see Dr. Clark.

In November 1974 petitioner applied to attend the University of Puget Sound Law School. One of the questions on the application form read "Have you ever been arrested or convicted of a crime?" Petitioner responded "yes" and attached the following explanation:

> I was arrested and charged with attempt and conspiracy to manufacture dangerous drugs, and criminal impersonation on 11 April 1974.
> With the cooperation of the District Attorney, I plead

guilty to three misdemeanors and was placed on a five year probationary period beginning 16 May 1974.

The Deputy District Attorney who handled the case, Daniel Hale, has given me permission to have the admissions committee contact him should further information be desired. His address is Mr. Daniel Hale, Court House Annex, P.O. Box 471, Boulder, Colorado 80302   Phone: 303–444–3776.

Board of Governors finding of fact 13.

In July of 1975, just prior to the time petitioner left Colorado to attend law school, petitioner's therapy with Dr. Clark was terminated by mutual agreement. Dr. Clark had been treating petitioner since 1973 for chronic paranoid schizophrenia. The treatment took two forms: (1) regular administration of Stelazine, an antipsychotic medication, and (2) regular counseling sessions. According to Dr. Clark, the Stelazine was designed to reduce the symptoms of schizophrenia; the counseling sessions were to assist petitioner in identifying and avoiding stressful situations. In July 1975, Dr. Clark concluded that these forms of treatment were no longer needed.

Petitioner's probation was terminated 3 years early by court order in June 1976.

Upon graduating from law school in December 1977, petitioner applied to take the Washington State Bar Association examination in January 1978. Question 6 on the application read "Have you ever been charged, detained or arrested for violation of any laws, including minor traffic infractions? If so, state date, place, court, nature of charges and disposition thereof." Petitioner responded "yes" and provided the following explanation:

> Sometime between June 1973 and June 1975, it seems to me that I plead guilty to two traffic tickets in Boulder Municipal Court, Boulder, Colorado.
>
> Also, I was involved in various incidents between March 1973 and April 1974 in Boulder, Colorado, District Court—Boulder, Colorado. These incidents ultimately resulted in conviction of three misdemeanor violations in May 1974, a suspended sentence and a five year probationary period. The probation period was terminated

after two years and two months, in June 1976, more than a year and a half ago.

Board of Governors finding of fact 15. In response to question 7 of his application, which read "Have you ever been charged with fraud in any proceeding?", petitioner responded "no". The crime of criminal simulation, however, contains fraud as an element.

Petitioner passed the 1978 winter bar exam. The bar conducted an investigation of petitioner's application. As part of that investigation, Dr. Clark was called upon to examine petitioner. After two 1–hour interviews with petitioner in August 1978, Dr. Clark responded to the question "Is Mr. Belsher going to be able to handle stress?" with the following observations:

> My opinion would be, yes. I say that pretty straight-forwardly and unequivocally. And I felt so at the time I wrote the various letters that he asked me to write to a number of schools, to law schools. It is true that he would certainly be under stress in law school and as a lawyer during trials, whatever. It was my impression that he had been through a lot of stress; he had dealt effectively and well with that stress and learned good techniques for dealing with stress. And on top of that, he, presumably, had also learned when he needed help, when the stress was getting out of hand. And with some two or two and a half years of psychotherapy behind him, with two different people, he, presumably, knows that help is readily available and is reasonably quickly effective.

Deposition of Clark, at 18–19. As to questions concerning the possibility of petitioner again becoming psychotic, Dr. Clark responded:

> . . . I think it [the possibility] is low enough that I feel confident in saying that he should be able to function well as an attorney.

Deposition of Clark, at 20.

A formal hearing was held regarding petitioner's application in November 1978. Subsequent to the hearing, the Board of Governors recommended the application be denied. Petitioner withdrew his application.

Petitioner reapplied for admission in 1981, at which time the Board of Governors reversed its previous recommendation and forwarded the case to this court. The file was remanded and a request made for additional psychiatric evaluation. In December 1981, Dr. Robert Carney examined petitioner. Dr. Carney observed that petitioner was of above average intelligence and had good judgment ability but lacked psychological insight into his past behavior. Dr. Carney concluded:

In my considered medical opinion, Mr. Belsher can be most appropriately diagnosed as having Schizophrenia, paranoid type, in remission (295.35, DSM–III). This diagnosis implies that the person did have an active episode of schizophrenic illness which lasted in excess of six months, but now essentially free of signs of illness. Dr. Clark originally diagnosed Mr. Belsher as having no psychosis. Later in treatment, after testing and time, Dr. Clark diagnosed his illness as paranoid schizophrenia and used antipsychotic medication with improvement. Dr. Clark spent the most time with him and would be in the best position to make the diagnosis. It is highly unusual for a person to make such a remarkable recovery after an episode of schizophrenia, but it is generally agreed that remission is a possibility. In my opinion Mr. Belsher shows very subtle signs that have to do with constricted emotions, emotional distance in the interview, curious lack of apparent remorse, and a poor understanding of the impact of his behavior on other people. Considering these observations, a case could be made for the diagnosis of Schizophrenia, residual type, in which there are no prominent psychotic symptoms but some indicators of the illness.

Dr. Carney indicated that the prognosis for petitioner appeared good, noting that there had been a 7–year remission without an active phase of the illness.

We must now decide whether petitioner is to be admitted to the practice of law in this state.

## II

In order to be admitted to the practice of law in our state, an applicant must "be of good moral character." APR

3(a) (formerly APR 2(b)(3)). The burden of demonstrating good moral character rests on the applicant. *Nall v. Board of Bar Examiners,* 98 N.M. 172, 646 P.2d 1236 (1982); *In re Greenberg,* 126 Ariz. 290, 614 P.2d 832 (1980); *In re Appell,* 116 N.H. 400, 359 A.2d 634 (1976); *In re Bowen,* 84 Nev. 681, 447 P.2d 658 (1968); *Hallinan v. Committee of Bar Examiners,* 65 Cal. 2d 447, 421 P.2d 76, 55 Cal. Rptr. 228 (1966). The question before us in this case is whether petitioner has satisfied that burden.

## A

Our task is made somewhat more difficult by the absence of reported decisions in this jurisdiction dealing with the nature of an initial applicant's burden to demonstrate good moral character. There are, however, several cases dealing with the burden faced by an applicant for *reinstatement* to the bar. In such cases, an applicant must show "that his reinstatement will not be detrimental to either the integrity and standing of the bar, the administration of justice, or the public interest. The burden is properly a heavy one." *In re Eddleman,* 77 Wn.2d 42, 43, 459 P.2d 387, 461 P.2d 9 (1969). *See also In re Batali,* 98 Wn.2d 610, 657 P.2d 775 (1983).

In imposing this "heavy burden" on the applicant who seeks to terminate a previous disbarment, this court has stated that "[o]ur primary purpose in imposing disciplinary measures on attorneys is to protect the public from misconduct and preserve its confidence in the judicial system." *In re Lavery,* 90 Wn.2d 463, 467, 587 P.2d 157 (1978). *See also Eddleman,* at 43 ("First, our concern in these matters is for the interest of the public and justice to the legal profession, as well as fairness to the applicant.").

Likewise, this court's ultimate responsibility in matters relating to admission of attorneys is to guard the public and its confidence in the judicial system. *See In re Evinger,* 604 P.2d 844 (Okla. 1979); *In re Florida Bd. of Bar Examiners,* 358 So. 2d 7 (Fla. 1978); *In re Lee,* 262 Ind. 439, 317 N.E.2d 444 (1974); *Goetz v. Harrison,* 154 Mont. 274, 462 P.2d 891

(1969). Therefore, in light of the common purpose underlying both reinstatement and admission proceedings, it is entirely appropriate for us to look to reinstatement cases for guidance in determining whether petitioner has met his burden of demonstrating good moral character.

## B

Petitioner argues that the burden of proof imposed upon an initial applicant for admission to the bar should not be as severe as that imposed upon an applicant for reinstatement. The rule advocated by petitioner is set out in *Tardiff v. State Bar,* 27 Cal. 3d 395, 612 P.2d 919, 165 Cal. Rptr. 829 (1980): "The person seeking reinstatement, after disbarment, should be required to present stronger proof of his present honesty and integrity than one seeking admission for the first time whose character has never been in question." *Tardiff,* at 403 (quoting *Roth v. State Bar,* 40 Cal. 2d 307, 313, 253 P.2d 969, 974 (1953)). *See also Ex parte Marshall,* 165 Miss. 523, 147 So. 791 (1933). *But see Reese v. Board of Comm'rs,* 379 So. 2d 564 (Ala. 1980).

We need not decide whether to adopt the rule enunciated in *Tardiff;* the rule is inapplicable to cases such as the one before us. Petitioner is not "one seeking admission for the first time whose character has never been in question." *Tardiff,* at 403. Rather, petitioner's character has been called into serious question by the events of 1973 and 1974. It is true that prior crimes such as petitioner's are not conclusive evidence of a lack of present good moral character, at least where they occurred a number of years prior to a request for admission to the bar. Nevertheless, such conduct does add to an applicant's burden of establishing present good moral character by requiring convincing proof of full and complete rehabilitation. *In re David H.,* 283 Md. 632, 392 A.2d 83 (1978). *See also Nall v. Board of Bar Examiners, supra.* An initial applicant for admission who has a history of serious misconduct is in much the same position as is a candidate for reinstatement to the bar in that both have manifested a propensity toward unaccept-

able conduct. We think it reasonable to require of each similar burdens of proof with respect to whether such conduct is likely to occur again. Such an approach is mandated by our role as protectors of the public and the public's confidence in the judicial system.

This court has said, in the context of reinstatement proceedings, that the major consideration is "whether the petitioner has affirmatively shown that he has overcome those weaknesses that produced his earlier misconduct." *In re Johnson,* 92 Wn.2d 349, 350, 597 P.2d 113 (1979). The same is true of initial admission proceedings where the applicant has a history of serious misconduct. In such cases, we consider: (1) the nature and character of the prior misconduct; (2) the sufficiency of the punishment undergone in connection therewith, and the making or failure to make restitution where required; (3) the applicant's attitude, conduct, and reformation subsequent to the prior misconduct; (4) his current proficiency in the law; and (5) the sincerity, frankness, and truthfulness of the applicant in presenting and discussing the factors relating to his prior misconduct and present admission. These factors are similar, although not identical, to those used in reinstatement cases. *See Johnson,* at 351.

## C

Application of these factors to the case before us leaves us unconvinced that petitioner has overcome those weaknesses that produced his earlier misconduct. The most notable aspect of petitioner's case is the serious nature of his prior misconduct. The bombing incident was an unjustified and premeditated act of violence of the worst sort. Such conduct evidences a chilling disregard for the rights of others, as well as a blatant disrespect of the law. The fact that petitioner placed the bomb in the car of his own parents only adds to the shocking nature of the act. Conduct evincing a lesser degree of moral turpitude than that involved here has resulted in disbarment. *See In re McGrath,* 98 Wn.2d 337, 655 P.2d 232 (1982) (attorney dis-

barred for second degree assault).

Petitioner contends that his past misconduct, although serious, was the result of mental problems which have since been corrected. He points to the fact that 9 years have gone by since the termination of his treatment with Dr. Clark. Petitioner argues that this passage of time without serious mishap demonstrates that he has overcome the problems that plagued him in the past and that he is possessed of present good moral character.

Having previously engaged in serious misconduct, petitioner must "clearly demonstrate" that he is now worthy of the public trust that is placed in attorneys; if doubt remains, fairness to the public and the bar requires that admission be denied. See Eddleman, at 43.

In this case, there is doubt as to petitioner's rehabilitation. Dr. Carney, who was the last to examine petitioner, expressed some doubt in his report as to petitioner's complete recovery. Dr. Carney stated that such a recovery after an active episode of schizophrenia would be "highly unusual." He further stated:

> In my opinion Mr. Belsher shows very subtle signs that have to do with constricted emotions, emotional distance in the interview, curious lack of apparent remorse, and a poor understanding of the impact of his behavior on other people. Considering these observations, a case could be made for the diagnosis of Schizophrenia, residual type, in which there are no prominent psychotic symptoms but some indicators of the illness.

The possibility that petitioner's apparent recovery is merely a temporary remission is a disturbing one. The uncertainty is compounded by the absence of any continuing record of petitioner's progress regarding his ailment after 1975. This lack of any psychiatric evaluation of the manner in which petitioner has handled stress over the past 9 years makes it difficult, if not impossible, to predict how petitioner would handle the high degree of stress which is inherent in the practice of law.

Another aspect of petitioner's case which bothers us is

the manner in which he answered the questions on his applications to law school in 1974 and to the bar in 1977 regarding past arrests and convictions. The answers are vague at best, giving no clue as to the serious nature of petitioner's misconduct. In short, petitioner did not demonstrate sincerity, frankness, candor and truthfulness in presenting and discussing the factors relating to his prior misconduct and present request for admission.

Finally, it must be recognized that the practice of law is a privilege, not a right. *In re Little,* 40 Wn.2d 421, 430, 244 P.2d 255 (1952). *See also State v. Russo,* 230 Kan. 5, 630 P.2d 711 (1981); *State Bar v. Heard,* 603 S.W.2d 829 (Tex. 1980); *In re Morris,* 175 Mont. 456, 575 P.2d 37 (1978). This privilege is burdened with certain conditions, one of which is possession of good moral character. It is this court's duty to insure that such conditions are met.

In light of the above, we do not believe it would be in the best interest of the public or the bar to admit petitioner to the practice of law in Washington at this time. The mere passage of time is not enough to convince us that petitioner has overcome those weaknesses that produced his prior misconduct. While the findings and recommendations of the Board of Governors that petitioner is fit to practice law are entitled to considerable weight, they are not conclusive. *In re Seijas,* 63 Wn.2d 865, 869, 389 P.2d 652 (1964). "The recommendations of the hearing panel and of the Board of Governors are advisory only." *In re Simmons,* 81 Wn.2d 43, 45, 499 P.2d 874 (1972). Petitioner's application is denied for the reasons detailed above.

WILLIAMS, C.J., and UTTER, BRACHTENBACH, DOLLIVER, DIMMICK, and PEARSON, JJ., concur.