BELSON, Associate Judge:
Daniel E. Manville applied for admission to the bar of the District of Columbia and passed the written bar examination administered in July of -1982. Following a hearing, the Committee on Admissions divided *1275 evenly on whether to recommend his admission, and thus declined to do so. This court then granted Manville 20 days to show cause why his application should not be denied. Having considered his brief and having heard oral argument, we remand to the Committee for its independent investigation of applicant's qualifications, any necessary further hearings, appropriate findings, and a recommendation.
I
Manville’s application presents issues of first impression in this jurisdiction because of his criminal record. For a period of over 2 years, commencing in about 1970, Man-ville led a life of crime which culminated in his being sentenced in June of 1973 for the offense of voluntary manslaughter. The record before us is the product of Man-ville’s ex parte presentation to the Committee. On that record, the facts concerning his background are undisputed. Manville was honorably discharged following 8 years of military service, including 13 months of service in Korea. After working for a Fisher Body factory in Michigan, he enrolled in 1969 at Central Michigan University and soon became involved in the campus drug culture. In October of 1970, he pleaded guilty to driving with a suspended license and served 3 days in jail. In the Summer of 1971 he received misdemeanor convictions for driving under the influence of intoxicating beverages and disorderly conduct. The record does not disclose his sentence. About this time, he began to carry a gun habitually and dealt in drugs. In the Summer of 1972 he was arrested for the possession of marijuana and LSD, and subsequently was convicted for possession of those substances for his personal use. He was sentenced to serve 60 days for those offenses.
In the Fall of 1972, Manville transferred to the Flint Branch of the University of Michigan. A student friend asked Man-ville’s assistance in recovering certain drugs and money believed to have been stolen by another student, Doug Edgar. In return for enforcing the first student’s claim on the drugs and money, Manville was told he could keep certain stereo equipment which was in Edgar’s apartment. Manville recruited his younger brother and another to aid him. In December 1972, they went to Edgar’s apartment. Each of the three was armed with a gun, and Man-ville’s brother also carried chloroform, which he is said to have been using “to get high.” The three gained admission to Edgar’s apartment on the pretext of buying drugs. Once inside, they threatened him with a knife and pistol-whipped him in an effort to secure the return of the drugs and money Edgar was supposed to have. Two acquaintances of Edgar showed up at the apartment while these events were occurring. Manville decided to use the chloroform to render the visitors unconscious lest they learn of the nature of his visit to Edgar. He also chloroformed Edgar. The administration of the chloroform killed one of the two visitors. Manville evaded arrest for 4 months.
Manville was indicted for first and second-degree murder and felony murder, but entered into a plea bargain pursuant to which he cooperated with the Michigan authorities in connection with campus drug activities and entered a plea of guilty to voluntary manslaughter. In May 1973, he received a sentence of 54 months to 15 years in prison.
While in prison, Manville assumed the role of “jailhouse lawyer.” In his own behalf, he filed state and federal collateral attacks on his manslaughter conviction and on his previous conviction for possession of LSD and marijuana. He also engaged in activities indicative of rehabilitation and self-reformation. He completed work on his bachelor of science degree and also earned a degree as a bachelor of general studies. He took a course in substance abuse and then assisted in teaching that course. He also tutored other inmates in mathematics and science. He participated in group psychological therapy, and became a co-therapist.
*1276 Upon his parole in September 1976, Man-ville entered a paralegal training program. He also worked for the Head Start Program in Lansing, Michigan, and assisted families with landlord-tenant and welfare problems. In the Summer of 1977, he served an internship with a Chicago program formed to combat racial bias. He then enrolled at Michigan State University in a master’s program in criminal justice, and also worked as a teaching assistant at several colleges.
After his parole ended in May of 1979, he enrolled at Antioch School of Law in Washington, D.C. He completed the course of studies there and engaged at the same time in numerous extracurricular activities, including serving as editor of the Prison Law Monitor, a national publication concerned with the criminal justice system. He also worked as a part-time law clerk in a local law firm. He completed his studies at Antioch one semester early. The record contains no indication of criminal behavior, drug abuse, or other antisocial behavior since appellant’s commitment to prison in June of 1973. His efforts to secure a pardon, however, have been thus far unsuccessful. This appears to be due, in part at least, to the fact that the parole board’s guidelines for recommending pardons require that at least 6 years have elapsed since discharge from parole. At the time of oral argument, that périod had not elapsed.
Manville then took and passed the July 1982 D.C. bar examination. Subsequently, he met informally with the Moral Character Subcommittee of the Committee on Admissions. After the subcommittee declined to recommend his admission, he sought and received from the full Committee a formal hearing on the issue of his good moral character. At the evidentiary hearing before the committee, Manville presented testimony or affidavits from over 20 persons, including lawyers, paralegals, and law professors, who have known him since his release from prison. All were aware of the fact of his prior convictions, although apparently not the details. All who expressed a view on the ultimate issue before the Committee opined that he is at this time a person of good moral character and fit for admission to the bar. The judge who sentenced Manville for manslaughter wrote the Committee a letter in which he stated: “I was of the opinion then and now that he did not intend to cause death.” He concluded. “As far as I am concerned, he has paid his legal debt to society for his unlawful conduct.... If you find him to be. sincere and trustworthy, I certainly would not criticize you if you were to grant him admission to the bar.”
After taking the matter under advisement, the six members of the Committee (there was one vacancy) divided evenly on the application. Each group of three members submitted a report. Since there was not a majority in favor of a recommendation, the court issued an order to show cause why his application for admission to the bar should not be denied. Counsel for Manville submitted a brief, and the court heard oral argument.
II
Before considering Manville’s application, we address briefly the nature of this court’s authority regarding admissions to the bar. It is, ultimately, for this court to decide whether an applicant shall be admitted to the bar of the District of Columbia.[1] Pursuant to its statutory grant of authority,[2] this court has created a seven- *1277 member Committee on Admissions to process and consider applications for admission, to administer the bar examination, and to certify to this court those persons whose applications the Committee approves. D.C.App.R. 46 (1985 Supp.).[3] Our rules provide that where an applicant requests review by this court, as Manville has, “[proceedings in court under this Rule shall be heard by the court on the record made by the Committee on Admissions.” D.C.App.R. 46(f)(4). Since neither the rule nor usual appellate practice contemplates our taking evidence or finding facts, we accept findings of fact made by the Committee unless they are unsupported by substantial evidence of record. See In re Heller, 333 A.2d 401, 402 (D.C.) (per curiam), cert. denied, 423 U.S. 840, 96 S.Ct. 70, 46 L.Ed.2d 59 (1975).[4] We also make due allowance for the Committee’s opportunity to observe and evaluate the demeanor of the applicant where relevant, e.g., with regard to such attitudes as sincerity or remorse. Finally, we afford the Committee’s recommendations some deference, since the Committee has been constituted as an arm of this court to deal regularly with issues concerning admissions to the bar and exists for the express purpose of making recommendations to the court. Nevertheless, the ultimate decision regarding admission or denial of admission remains for this court to make.
We have not made any specific provision in our rules for independent investigations by the Committee. As a result, the Committee normally makes its record upon the ex parte presentation of the applicant and, where a formal hearing is held, upon its examination of the applicant and applicant’s witnesses. This was the procedure followed by the Committee on Manville’s application. Yet, as Counsel to the Committee acknowledged at oral argument, the Committee has the inherent power to conduct independent investigations, and is aware that it can incur the expenses necessary to do so.
This application demonstrates that instances will arise where an independent investigation is necessary to make an adequate record. The United States Supreme Court has recognized that such an investigation is one of the basic tools .an admissions committee has for testing an applicant’s prima facie showing of fitness to practice law. Konigsberg v. State Bar, 366 U.S. 36, 41-42, 81 S.Ct. 997, 1001-1002, 6 L.Ed.2d 105 (1961). See, e.g., In re Application of Davis, 38 Ohio St.2d 273, 313 N.E.2d 363 (1974) (per curiam) (bar admissions committee conducted independent investigation of applicant who previously had been convicted of a felony).[5]
Although an ex parte showing is adequate for consideration of a routine application, it may not serve the needs of the public and the legal community where a convicted felon applies for admission. This is not to deprecate the nature and quality of the showing applicant Manville made before the Committee; his evidence supports his contention that he is rehabilitated. Nor is it to impugn his witnesses or to suggest that their testimony was less than candid and credible.
We think it unwise, however, to rely on an entirely ex parte procedure when the *1278 committee must resolve a serious issue of fact concerning the applicant’s fitness and moral character. An independent investigation, one similar to the investigations commonly used in connection with appointments to positions with the United States Government, would reach beyond the witnesses selected by the applicant. It would inquire of public authorities, and also colleagues, acquaintances and neighbors, both present and past. It would extend to at least a few persons who knew him before his imprisonment. It would ascertain whether applicant has the qualities of personality and behavior that bespeak rehabilitation and good moral character. It would provide the Committee with an independent look at the applicant’s conduct since his release from prison.
We take this occasion to declare that in cases such as the present where an applicant has committed a felony or other serious crime,[6] the Committee should weigh the need for an independent investigation; where the applicant has committed so serious a crime as the homicide committed by the applicant here, such an independent investigation should invariably be conducted.[7]
Since we have determined that it is appropriate to remand this case for further proceedings, we wish to dispel any uncertainty which may exist concerning the burden of proof the applicant has on this application. It appears from the reports of the Committee that a majority of its members took the view that it was incumbent upon Manville to establish by “convincing” or “clear and convincing” evidence that he is rehabilitated and is now of good moral character and qualified to practice law. Such is not the case. Our Rule 46, which controls admission to the bar, states in pertinent part, as follows:
(d) MORAL CHARACTER AND GENERAL FITNESS TO PRACTICE LAW. No applicant shall be certified for admission by the Committee until a careful examination has been made into the applicant’s moral character and general fitness to practice law and a favorable report is rendered thereon. The Committee may give notice of the application by advertisement in a newspaper or posting of a public notice.
(e) QUANTUM AND BURDEN OF PROOF. The burden of demonstrating, by a preponderance of the evidence, that an applicant is qualified and fit to practice law in the District of Columbia shall be upon the applicant.
D.C.App.R. 46 (1985 Supp.).
We point out that the rule makes no distinction between applicants who have been convicted of a felony and other applicants. All applicants must prove their qualifications and fitness by a preponderance of the evidence. See In re Heller, 333 A.2d at 402. At the same time, we recognize that to the extent that the reports of the Committee indicate that Manville has a heavy burden of persuasion, they are correct. By his own admission, Manville committed a homicide in the course of a burglary and thereafter plea-bargained for a conviction of voluntary manslaughter. He also admits, with candor, to having engaged in a continuous pattern of criminal and antisocial conduct for over 2 years. In their thorough and illuminating brief, Man-ville’s counsel have been able to point to no instance in which a person convicted of homicide, has been admitted to the practice *1279 of law.[8] We do not, as we will explain, adopt the position that a conviction of homicide,-per se, requires denial of Manville’s application. Indeed, no jurisdiction has adopted a policy of per se exclusion in such cases, so far as the briefs of the parties and our review of the case law reveal. We merely recognize, and agree with the suggestion of the Committee, that applicant Manville has much to overcome in order to prevail by a preponderance of the evidence.
Ill
Because we have not been called upon previously to examine the relevance of a previous felony conviction to the inquiry into moral character, we think it worthwhile to review the matter and set forth some of the principles we consider significant. Courts generally reject a rigid rule that evidence of criminal convictions conclusively evinces an applicant’s lack of good moral character.[9] They do so because the ultimate determination to be made is whether, at present, an applicant has the good moral character required for admission to the Bar.[10] “That the absence of good moral character in the past is secondary to the existence of gobd moral character in the present is a cardinal principle in considering applications for original admission to the Bar.” Application of Allan S., 282 Md. 683, 689, 387 A.2d 271, 275 (1978).[11] As a matter of due process and equal protection, every qualification for bar admission — good moral character included — must bear a rational relationship to an applicant’s fitness or capacity to practice law. Schware v. Board of Bar Examiners, 353 U.S. 232, 239, 77 S.Ct. 752, 756, 1 L.Ed.2d 796 (1957). Thus, rather than taking the view that prior serious misconduct invariably requires disqualification, courts tend to consider the facts of each case in light of the totality of circumstances surrounding an application for bar admission. In re Dileo, 307 So.2d 362, 364 (La.1975).
Of course, evidence of criminal convictions usually suggests unfitness and therefore should be considered in the overall assessment of an applicant’s fitness to practice law.[12] Evidence of the applicant’s reform and rehabilitation must also be taken into account.[13]
Although an applicant’s prior criminal conviction is not conclusive of a lack of fitness, “his burden of establishing his present good moral character takes on the added weight of proving his full and com- *1280 píete rehabilitation subsequent to the conviction.” Application of Davis, 38 Ohio St.2d 273, 274, 313 N.E.2d 363, 364 (1974).[14] As Justice Handler has observed, speaking for the Supreme Court of New Jersey in In re Matthews:
The more serious the misconduct, the greater the showing of rehabilitation that will be required.... However, it must be recognized that in the case of extremely damning past misconduct, a showing of rehabilitation may be virtually impossible to make.
462 A.2d at 176 (citation omitted).
The United States Supreme Court’s opinion in Schware illustrates the sort of evaluation process that must be undertaken in determining whether a bar applicant with a history that includes misconduct is morally fit to practice law. In that case the Supreme Court reviewed a decision of the New Mexico Supreme Court denying Schware the opportunity to take the bar examination on the grounds of lack of good moral character because of his use of aliases, his record of arrests, and his past membership in the Communist Party. The Supreme Court weighed the evidence of Schware’s past improprieties against his showing of good moral character, and reversed. The Court noted many factors that mitigated his past acts of misconduct, and deemed his affiliation with the Communist Party merely a matter of political belief. 353 U.S. at 244. The Court also carefully considered the evidence of Schware’s character in the period subsequent to his misconduct. The Court repeatedly emphasized the duration of time that had passed since his episodes of misconduct, id., 353 U.S., at 241, 243, 246, 77 S.Ct. at 757, 758, 760, all of which occurred when he was a young man. It found no evidence that during the 15 years prior to his bar application, Schware had engaged in any conduct reflecting adversely on his character. Id. at 239, 77 S.Ct. at 756. Schware’s religious and humanitarian endeavors, his industry and his candor were all noted by the Court, as was favorable testimony about his good character given by his professors, associates, and the rabbi of his synagogue. Id. at 240, 77 S.Ct. at 756. In light of this evidence the Court concluded that Schware was morally fit to practice law; it ruled that the State of New Mexico had imper-missibly denied him the opportunity to qualify for such practice. Id. at 246-47, 77 S.Ct. at 760-61.
We find instructive the factors considered by the Court in Schware and, subsequently, by other courts in their assessment of the moral fitness of applicants whose backgrounds are tainted by criminal convictions. They include:
1. The nature and character of the offenses committed.[15]
2. The number and duration of offenses.[16]
3. The age and maturity of the applicant when the offenses were committed.[17]
*1281 4. The social and historical context in which the offenses were committed.[18]
5. The sufficiency of the punishment undergone and restitution made in connection with the offenses.[19]
6. The grant or denial of a pardon for offenses committed.[20]
7. The number of years that have elapsed since the last offense was committed, and the presence or absence of misconduct during that period.[21]
8. The applicant’s current attitude about the prior offenses (e.g., acceptance of responsibility for and renunciation of past wrongdoing, and remorse).[22]
9. The applicant’s candor, sincerity and full disclosure in the filings and proceedings on character and fitness.[23]
10. The applicant’s constructive activities and accomplishments subsequent to the criminal convictions.[24]
11. The opinions of character witnesses about the applicant’s moral fitness.[25]
This list of factors is intended to be illustrative rather than exhaustive. We agree with the observation of the Court of Appeals of Maryland that “there is no litmus test by which to determine whether an applicant for admission to the Bar possesses good moral character.” Application of Allan S., 387 A.2d at 275. These factors can, at best, serve as mere indicia of an applicant’s good moral character.
This court has previously noted that the term “good moral character” is “of broad dimension and ... can be defined in many ways.” In re Heller, 333 A.2d at 402 (citing Konigsberg v. State Bar of California, 353 U.S. 252, 263, 77 S.Ct. 722, 728, 1 L.Ed.2d 810 (1957)); accord In re Petition of Wright, 690 P.2d at 1136; In re Application of Matthews, 462 A.2d at 173. Although the term escapes precise definition it does, nevertheless, possess a core of meaning. As Justice Frankfurter stated:
[A]ll the interests of man that are comprised under the constitutional guarantees given to “life, liberty and property” are in the professional keeping of law *1282 yers.... From a profession charged with such responsibilities there must be exacted those qualities of truth-speaking, of a high sense of honor, of granite discretion, of the strictest observance of fiduciary responsibility, that have, throughout the centuries, been compendi-ously described as “moral character.”
Schware, 353 U.S. at 247, 77 S.Ct. at 760 (Frankfurter, J., concurring). Other traits have been deemed essential components of an applicant’s good moral character: respect for the rights of others and for the law, Florida Board of Bar Examiners; In re G.W.L., 364 So.2d 454, 458 (Fla.1978); accord, In re Petition of Wright, 690 P.2d at 1136; In re Haukebo, 352 N.W.2d at 754; fairness, Florida Board of Bar Examiners; In re G. W.L., 364 So.2d at 458; accord, In re Petition of Wright, 690 P.2d at 1136; In re Haukebo, 352 N.W.2d at 754; trustworthiness and reliability, In re Application of Matthews, 462 A.2d at 174; and a professional commitment to the judicial process and the administration of justice. Id. These character traits, taken together, constitute the core of the standard of good moral character that we deem most consistent with our principal aims in regulating bar admission, namely, the protection of prospective clients, and the assurance of the ethical, orderly, and efficient administration of justice. See In re Application of Matthews, 462 A.2d at 174; Florida Board of Bar Examiners; In re Eimers, 358 So.2d 7, 9 (Fla.1978) (per curiam); Rosenthal v. State Bar Examining Committee, 116 Conn. 409, 415, 165 A. 211, 213 (1933).
In view of what we have said we will remand Manville’s application and the record herein to the Committee on Admissions for further proceedings consistent with this opinion, including investigation, hearings before the Committee, and a report of the Committee’s findings and conclusions.

So ordered.

. Kennedy v. Educational Testing Service, Inc., 393 A.2d 523 (D.C.1978); Powell v. Nigro, 543 F.Supp. 1044, 1046 (D.D.C.1982), remanded mem., 229 U.S.App.D.C. 142, 711 F.2d 420, cert. denied, — U.S. -, 104 S.Ct. 149, 78 L.Ed.2d 139 (1983); see Brooks v. Laws, 92 U.S.App.D.C. 367, 377, 208 F.2d 18, 29 (1953) (quoting Ex parte Secombe, 60 U.S. (19 How.) 9, 13, 15 L.Ed. 565 (1857) to the effect that “ ‘it rests exclusively with the court to determine who is qualified to become one of its officers, as an attorney and counsellor’ ”).

. D.C.Code § ll-2501(a) (1981), dealing with admission to the bar, states as follows:
*1277 The District of Columbia Court of Appeals shall make such rules as it deems proper respecting the examination, qualification, and admission of persons to membership in its bar, and their censure, suspension, and expulsion.

.At the time of the Committee’s consideration of Manville's application, the portion of Rule 46 regarding admission to the bar was enumerated as D.C.App.R. 46-1.

. Cf. D.C.Bar R. XI, § 7(3) (1984 ed.) (referring to this court’s scope of review of findings made by the Board on Professional Responsibility).

. Cf. D.C.Bar Rule XI, §§ 4(3)(a) (Board on Professional Responsibility has power and duty to investigate alleged grounds for discipline or alleged incapacity of attorneys), 6(l)(b) (Bar Counsel has power and duty to investigate matters involving alleged misconduct by an attorney), 7(1) (Bar Counsel shall initiate and conduct all investigations of attorneys).

. Cf. D.C.Bar Rule XI, § 15(2) (defining "serious crime” in connection with suspension from practice).

. Three of our colleagues call for an immediate en banc hearing without awaiting the results of further investigátion. They say that “this court does the public, our bar, and our Admissions Committee an injustice when it hedges” on the facts of this case and orders further investigation. We think that further investigation while the application is held in abeyance does no injustice, but that an injustice might be done if the court were not to give full consideration to Manville’s assertion that he has achieved an exceptional rehabilitation and has thus overcome the heavy burden he carries due to his previous crimes. The independent investigation will aid that consideration.

. See In re Petition of Wright, 102 Wash.2d 855, 690 P.2d 1134 (1984) (en banc); In re Application of Roger MM, 96 A.D.2d 1133, 466 N.Y.S.2d 873 (N.Y.App.Div.1983); In re Moore, 308 N.C. 771, 303 S.E.2d 810 (1983).

. E.g., In re Belsher, 102 Wash.2d 844, 849, 689 P.2d 1078, 1083 (1984) (en banc); In re Elkins, 308 N.C. 317, 322, 302 S.E.2d 215, 218, cert. denied, — U.S. -, 104 S.Ct. 490, 78 L.Ed.2d 685 (1983); In re Petition of Diez-Arguelles, 401 So.2d 1347, 1349-50 (Fla.1981); Reese v. Board of Commissioners, 379 So.2d 564, 569-70 (Ala.1980); Application of Allan S., 282 Md. 683, 689, 387 A.2d 271, 275 (1978); Application of Davis, 38 Ohio St.2d 273, 274, 313 N.E.2d 363, 364 (1974) (per curiam).

. In re Haukebo, 352 N.W.2d 752, 754 (Minn.1984); In re Application of Matthews, 94 N.J. 59, 81, 462 A.2d 165, 176 (1983); Application of Allan S., 387 A.2d at 275; see Schware v. Board of Bar Examiners, 353 U.S. 232, 241, 243, 246, 77 S.Ct. 752, 760, 1 L.Ed.2d 796 (1957); In reDreier, 258 F.2d 68, 69-70 (3d Cir.1958); In re Application of Jenkins, 94 N.J. 458, 467 A.2d 1084, 1091 (1983); In re Appeal of Evinger, 629 P.2d 363, 367 (Okl.1981).

. Accord In re Application of James G., 296 Md. 310, 312, 462 A.2d 1198, 1200-01 (1983); In re Application of G.L.S., 292 Md. 378, 392, 439 A.2d 1107, 1115 (1982); In re Application of A.T., 286 Md. 507, 513, 408 A.2d 1023, 1027-28 (1979); Application of David H., 283 Md. 632, 638, 392 A.2d 83, 87 (1978).

. In re Elkins, 302 S.E.2d at 218; Application of Allan S., 387 A.2d 275; In re Florida Board of Bar Examiners, 183 So.2d 688, 690 (Fla.1966).

. E.g., In re Dreier, 258 F.2d at 69-70; In re Petition of Diez-Arguelles, 401 So.2d at 1348-50; Application of Allan S., 387 A.2d at 275; see also Hightower v. State Bar, 34 Cal.3d 150, 666 P.2d 10, 193 Cal.Rptr. 153 (1983) (prior misconduct not resulting in criminal conviction); In re Application of Matthews, 462 A.2d at 176 (same); see generally, Duhl, Character and Fitness — The Rehabilitation Factor, 52 B. Examiner, Feb. 1983, at 11.

. Accord In re Belsher, 689 P.2d at 1083; In re Application of Cason, 249 Ga. 805, 807, 294 S.E.2d 520, 522 (1982) (per curiam); Application of Allan S., 387 A.2d at 275.

. In re Belsher, 689 P.2d at 1083; Application of Allan S., 387 A.2d at 275; see In re Application of George B., 297 Md. 421, 466 A.2d 1286 (1983); In re Application of Matthews, 462 A.2d at 176.

. In re Haukebo, 352 N.W.2d at 754; see In re Application of Cason, 294 S.E.2d at 523; In re Application of K.B., 291 Md. 170, 177, 434 A.2d 541, 545-46 (1981); In re Appeal of Evinger, 629 P.2d at 368; Application of Walker, 112 Ariz. 134, 138, 539 P.2d 891, 895 (1975) (en banc) (per curiam), cert. denied, 424 U.S. 956, 96 S.Ct. 1433, 47 L.Ed.2d 363 (1976). Compare In re Application of G.L.S., 439 A.2d at 1117 (finding applicant morally fit where his participation as driver of getaway car in bank robbery “constituted a single, isolated episode in the applicant's life”) with Application of David H., 392 A.2d at 88 (finding insufficient evidence of good moral character where applicant had engaged in “thievery of a repetitive nature”).

.Martin B. v. Committee of Bar Examiners, 190 Cal.Rptr. 610, 615, 661 P.2d 160, 165, 33 Cal.3d 717 (1983) (en banc) (per curiam); In re Application of Taylor, 293 Or. 285, —, 647 P.2d 462, 467 (1982) (en banc) (per curiam); In re Application of K.B., 434 A.2d at 546.

. See Schware, 353 U.S. at 242-43, 245, 77 S.Ct. at 758-59, 759; Hallinan v. Committee of Bar Examiners, 65 Cal.2d 447, 421 P.2d 76, 86-88, 55 Cal.Rptr. 228, 238-40 (1966) (en banc). Compare Application of Allan S., 387 A.2d at 276 (concluding that applicant’s prior misconduct not justified by its social and historical context).

. In re Belsher, 689 P.2d at 1083. See In re Application of K.B., 434 A.2d at 545.

. See In re Florida Board of Bar Examiners, 350 So.2d 1072, 1073 (Fla.1977) (per curiam); In re Florida Board of Bar Examiners, 341 So.2d 503, 505 (Fla.1976) (per curiam); In re Florida Board of Bar Examiners, 183 So.2d at 690; cf. In re Phillips, 452 A.2d 345, 347 (D.C.1982) (conviction of an offense involving moral turpitude ultimately results in disbarment in all cases except those in which a pardon is granted); In re Kerr, 424 A.2d 94, 98-99 (D.C.1980) (en banc) (same); D.C.Code § 11-2503(a) (1981) (same).

. In re Belsher, 689 P.2d at 1083; In re Application of Matthews, 462 A.2d at 176; Martin B., 661 P.2d at 165; In re Petition of Diez-Arguelles, 401 So.2d at 1349; see In re Application of George B., 466 A.2d at 1286; Application of Allan S., 387 A.2d at 275.

. In re Belsher, 689 P.2d at 1083; In re Application of Matthews, 462 A.2d at 176; see In re Petition of Wright, 690 P.2d at 1136; In re Application of G.L.S., 439 A.2d at 1117; Application of Allan S., 387 A.2d at 276; March v. Committee of Bar Examiners, 67 Cal.2d 718, 433 P.2d 191, 200, 63 Cal.Rptr. 399, 408 (1967) (en banc) (per curiam).

. In re Belsher, 689 P.2d at 1083; In re Application of Matthews, 462 A.2d at 176; In re Elkins, 302 S.E.2d at 220-21; In re Beasley, 243 Ga. 134, 252 S.E.2d 615 (1979) (per curiam); see In re Moore, 303 S.E.2d 615 (1979) (per curiam); see In re Moore, 303 S.E.2d at 817; In re Application of Taylor, 647 P.2d at 467; In re Application of K.B., 434 A.2d at 545-46.

. In re Application of Matthews, 462 A.2d at 176; In re Application of Cason, 294 S.E.2d at 522-23; In re Application of Davis, 61 Ohio St.2d 371, 403 N.E.2d 189, 191 (1980) (per curiam); see In re Petition of Diez-Arguelles, 401 So.2d at 1348-50.

. In re Application of Matthews, 462 A.2d at 176; Application of Allan S., 387 A.2d at 276; Application of Gimbel, 271 Or. 671, 672-75, 533 P.2d 810, 811-12 (1975) (en banc) (per curiam); see In re Petition of Diez-Arguelles, 401 So.2d at 1349; In re Davis, 403 N.E.2d at 191; March, 433 P.2d at 200.