IN RE: PETITION OF MARK BIRMINGHAM TO
WAIVE SCR 67(2).

No. 23231

January 21, 1994                                   866 P.2d 1150

---

*Mark K. Birmingham,* In Proper Person, for Petitioner.

*Ronald D. Alling,* Chairman, Board of Bar Examiners, *Leonard I. Gang,* Bar Counsel and *Rosalie Small,* Executive Director, Las Vegas, for State Bar of Nevada.

## OPINION

By the Court, SPRINGER, J.:

Petitioner Birmingham is a pilot and in 1983 he admittedly was involved in a scheme to smuggle marijuana into this country from South America. He voluntarily withdrew from this illicit activity and entered law school. While he was in law school, his past caught up with him, and he was arrested by federal officials. He pleaded guilty to a federal charge of conspiracy to distribute marijuana and was sent to prison. Because of his cooperation with law enforcement, he was placed on early parole in February of 1989. While on parole, Birmingham returned to law school and was able to graduate in May of 1990, whereupon he took the Nevada Bar Examination and passed it.

Birmingham was discharged from parole on March 12, 1991. After hearings conducted in May of 1991 and July of 1991, the State Board of Bar Examiners recommended to this court that we admit him to the practice of law. On October 25, 1991, in a written order, this court refused to accept the Board's recommendation for Birmingham's admission and questioned the Board's conclusion that Birmingham possessed the "suitable moral character" that would qualify him to be numbered among those licensed to practice law in this state. We did, however, at the

*same time, also conclude that, in the light of Birmingham's* commendable efforts to overcome past mistakes, we would accord serious future consideration to an appropriately documented petition for a waiver of SCR 67(2).[1]

Having reviewed the instant petition and the record on file before this court, the members of this court have all concluded that Birmingham has at this time clearly and convincingly demonstrated full and complete rehabilitation. *See* In re Belsher, 689 P.2d 1078, 1083 (Wash. 1984) (prior criminal conduct adds to applicant's burden by requiring convincing proof of full and complete rehabilitation). As the Dissenting Opinion notes, none of the members of this court are any longer worried about whether Birmingham is of "suitable moral character." No one, including the dissenting justices, questions Birmingham's suitability to be a lawyer or considers him to be a "threat to the public in the form of unethical or criminal behavior." JUSTICES STEFFEN and ROSE dissent "solely upon the ground that Birmingham's admission will discretely add to a significant and enduring increase in public distrust of the legal profession."

We understand how it is that JUSTICES ROSE and STEFFEN might consider Birmingham's conspiracy to distribute marijuana to be so "extremely serious" as to disqualify him forever from practicing law and understand their belief that to admit him to practice law would "permit further erosion of public respect for the profession." This is their own, personal moral judgment, and they are certainly entitled to make this stern judgment. In light, however, of the two dissenting justices' frank recognition of "Mr. Birmingham's many positive accomplishments since the commission of his criminal offenses," "the number and magnitude of his achievements," their "express confidence in Mr. Birmingham's rehabilitation" and, perhaps most significantly, JUSTICE STEFFEN's and CHIEF JUSTICE ROSE's "belie[f] that he will distinguish himself in the practice of law," we, in the majority, believe that the Board's position is more reasonable than theirs and that Birmingham's isolated dereliction, ten years ago, should not brand him forever. Birmingham is not a serial killer or a predator on the estates of aged widows. When he was a young man he improvidently tried to "make a quick buck," even, perhaps, as JUSTICES STEFFEN and ROSE maintain, at the expense of marijuana "victims" who "have suffered and will suffer, at least in part, from Birmingham's crimes." (STEFFEN-ROSE Dissent at 3.) None in the Majority, in any sense, minimizes the seriousness of conviction of a federal offense of conspiracy to

---

[1]SCR 67(2) provides that an applicant who has been once denied admission for failure to meet the necessary character requirements shall not thereafter be permitted to apply for admission.

distribute marijuana, but this does not mean that we have to reject the Board's recommendation of approval, based entirely on this past conviction.

The Board, having given hours, even days, to this matter in the form of investigations and hearings, is in a better position than we are to pass judgment on the question of whether admitting Mr. Birmingham to practice law is so destructive of "Public confidence in the bar as a whole" as to require denying him membership in the Bar. Although we respect the right of CHIEF JUSTICE ROSE and JUSTICE STEFFEN to be particularly strict when it comes to drug conspirators, we hold that there is insufficient reason in this case to reject the Board's favorable recommendation and to exclude Mr. Birmingham solely upon the ground of his past conviction and the dissenting Justices' perceptions that his admission would substantially diminish "public confidence in the bar as a whole."

We grant Mr. Birmingham's petition; and we direct the State Bar of Nevada to admit Mark K. Birmingham to the practice of law in this state upon his compliance with any heretofore unsatisfied requirements for admission.

YOUNG and SHEARING, JJ., concur.

STEFFEN, J., with whom ROSE, C. J., joins, dissenting:

I agree with the majority and the Board of Bar Examiners that Mark Birmingham has demonstrated rehabilitation. Moreover, I have little objective cause to doubt that Mr. Birmingham will perform responsibly as a lawyer. In any event, since he is being admitted to the Nevada bar by a majority of the members of this court, I regret that I must register my dissent to his admission.

This court has previously recognized the two-fold purpose of lawyer discipline. In the case of In re Cochrane, 92 Nev. 253, 549 P.2d 328 (1976), we stated that the fundamental "'objective of disciplinary action . . . is not additional punishment of the attorney but rather to protect the public from persons unfit to serve as attorneys . . . *and to maintain public confidence in the bar as a whole.'"* *Id.* at 255, 549 P.2d at 329 (quoting In re Ford's Case, 149 A.2d 863, 864 (N.H. 1959)) (emphasis added). *See also* State Bar of Nevada v. Claiborne, 104 Nev. 115, 219, 756 P.2d 464, 531 (1988). Although this is not a case involving the discipline of a licensed attorney, the twin objectives of lawyer discipline have equal significance in qualifying applicants for admission to the bar. SCR 51, which addresses the qualifications of applicants for examination, states at subsection (4) that an applicant must demonstrate good moral character and willingness and ability to abide by *high ethical standards* required of attorneys.

The Washington Supreme Court has recognized the "common purpose" underlying proceedings to reinstate suspended or disbarred attorneys and to initially screen persons who seek admission to the practice of law. In both cases, the fundamental concerns include protecting the public from unethical behavior, preserving public confidence in the judicial system and legal profession, and fairness to the applicant. *See* In re Belsher, 689 P.2d 1078, 1082 (Wash. 1984).

As noted above, I have no reason to question the judgment of those who have concluded that Mr. Birmingham will not pose a threat to the public in the form of unethical or criminal behavior. I dissent solely upon the ground that Birmingham's admission will discretely add to a significant and enduring increase in public distrust of the legal profession.

Assuming, as I do, that the judiciary and legal profession must bear the primary responsibility for reversing the trend of public disrespect for attorneys, then judges and lawyers must be at the forefront of measures designed to achieve that objective. I suggest, most reluctantly, that today's action by the majority is counterproductive when exposed to the stark realities of a cost-benefit analysis. Accepting, as I do, the premise that public confidence in the legal profession is preeminent among a complex of factors this court must consider, it seems axiomatic that it is usually better to exclude rehabilitated ex-felons from the practice of law than to permit further erosion of public respect for the profession by authorizing their admission to the bar.

I realize that the aforementioned premise denies, to an extent, individual justice to a rehabilitated and repentant ex-felon. It must be remembered, however, that Birmingham elected to pursue his criminal endeavors. They were not forced upon him. During the years 1982 and 1983, Birmingham piloted a small aircraft to and from South America for the purpose of smuggling contraband into the United States. He would fly from a small airport near New Orleans to the South American country of Belize, where he would pick up a cargo of 250-275 pounds of marijuana for delivery to several small airstrips in this country. Although Birmingham eventually abandoned his criminal enterprise, he did not voluntarily reveal his crimes to law enforcement authorities. After his apprehension, he served sixteen months of a four-year sentence, and was then given an early release on parole in February of 1989. He successfully completed his parole on March 12, 1991, and was discharged.

Birmingham's crimes were extremely serious. He was instrumental in supplying huge quantities of marijuana for distribution in the United States. There is no way of telling how many lives, especially among our youth, were destroyed or devastated by the drugs flown into this country by our new admittee to the legal

profession. The full extent and nature of the consequences resulting from the hundreds or thousands of pounds of marijuana smuggled here by Birmingham can never be measured. Moreover, we will never know the names or the number of victims, past and future, that have suffered and will suffer, at least in part, from Birmingham's crimes. Birmingham will now turn to the practice of law, but his victims will continue to mount in the years to come.

I readily admit that I speak from the perspective of past generations, and that "times have changed." To illustrate the point, I refer the reader to an article entitled *Hijinks That Can Haunt Your Life* appearing in the Readers Digest dated June 1965. The author, Jerome M. Lasky, was a judge on New York's Nassau County District Court who had made a special study of youthful lawbreakers. The article referred to a young college student who had accidently knocked over a marker at Jones Beach, although he was with a group of students who had been deliberately taunting an officer by knocking over signs as soon as the officer turned his back. The student's father, despite his son's innocence, advised the son to pay the fine rather than lose time from school in fighting the charge at a trial. After noting why the boy was pleading guilty, the story as related by Judge Lasky continued as follows:

> "What kind of career do you hope to have?" I asked. "I plan to be a lawyer," he replied. I refused to accept his plea, explaining that it would be tantamount to a conviction and could have grave consequences for his future. "While your friends from law school are hanging out their shingles, you'll still be explaining your record to the character committee of the bar," I told him.
>
> Too many young people today are woefully unaware of the harm that a police record for a seemingly petty violation—resulting in a fine or suspended sentence—can do to their lives. When, in a moment of irresponsibility, they step over the line between high-spirited fun and legal offense, they fail to consider that the results can be disastrous.
>
> . . . .
>
> If you have a police record it can be difficult, in some instances impossible, to go into any business or profession where a special license is required, such as law or real-estate brokerage.

I burden this dissent with the quoted material in order to illustrate how far we have gone in tolerating serious criminal records on the part of those who are accepted in the legal profession. I suggest that if we continue to permit "rotten apples" (I regret the metaphor even as I write it, for in no real

sense is Mr. Birmingham either "rotten" or incapable of positive contribution to the legal profession in particular and society in general) in the barrel, the overall quality of the apples will continue to suffer. We can selectively show compassion for the rehabilitated ex-felon and admit him or her to the practice of law, but I seriously question whether, in so doing, we can concomitantly hope to enhance public respect for the profession, especially where the admittee has been involved in crimes of violence or the supplying or sale of substantial quantities of illicit drugs.

Mr. Birmingham was discharged from parole slightly less than three years ago. Under Nevada law, he is ineligible for public office, may not vote or own or possess a firearm. The foregoing disabilities of an ex-felon whose civil rights have not been restored by the proper pardoning authority reflect the seriousness with which our society views the commission of felony crimes. We have not been informed that Birmingham has been pardoned and received the restoration of his civil rights, so I must assume, especially in light of his comparatively recent discharge from parole, that he has not yet obtained such relief. This is significant in that society withholds from Birmingham the cherished rights to vote, hold public office and bear arms, but we conclude that he is qualified to be clothed with the public trust invested in attorneys.

I suggest that the court's action today also undermines the values and policy reflected in SCR 67(2), which provides that an applicant who has been once denied admission for failure to meet the necessary character requirements shall not thereafter be permitted to apply for admission. The values underlying Rule 67(2) obviously include that of sound moral character as revealed by the applicant's background. The policy implicated by the rule is that of maintaining public confidence in the state bar. Obviously, had the rule not contemplated a permanent disqualification based upon an applicant's unacceptable character qualifications, it would not have been adopted in its present form.

It may be of value to note various comments concerning the reported state of the legal profession today. The ABA Journal of September 1993, noted a survey of lawyers taken last year indicating that "improving the standing of the [legal] profession in the eyes of the public [was] one of the highest priorities they want[ed] the ABA to address." The article also observed that

> there [is not] much comfort in a comparison with the public's overall view of other professions. Compared to lawyers' favor-ability rating of 40 percent, teachers received 84 percent; pharmacists, 81 percent; police officers, 79 percent; doctors, 71 percent; accountants, 60 percent; and bankers, 56 percent. The only other professions in the survey that tested with less than majority favorable feelings were stockbrokers (28 percent) and politicians (21 percent).

The public survey also revealed that "barely one in five (22 percent) said the phrase 'honest and ethical' describes lawyers. Nearly twice as many (40 percent) said this description does not apply." The survey also disclosed that

> [a]lmost half (48 percent) of those surveyed said that as many as three in 10 lawyers lack the ethical standards necessary to serve the public, which matches exactly the proportion who say the same thing about auto mechanics. On the ethics measure, the 48 percent rating for lawyers far exceeds the proportion who feel dishonesty is a problem for accountants (22 percent), doctors (28 percent), and bankers (30 percent).

Gary A. Hengstler, *Vox Populi,* ABA Journal, September 1993, at 60-62.

A recent article published in USA Today stated, in part:

> Public opinion of lawyers keeps falling. Lawyer jokes are popular and advertisers, such as Miller Brewing, air TV commercials showing rodeo cowboys lassoing briefcase-carrying lawyers. Meanwhile, a National Law Journal poll this year says lawyers are increasingly seen as dishonest, greedy and selfish. The number of people who said lawyers are less honest than most people rose to 31% from 17% in 1986; 73% said there are too many lawyers, up from 55%. "America's perception of the legal profession has clearly taken a turn for the worse," says editor Doreen Weisenhaus.

Finally, a recent article in The National Law Journal alarmingly, but not surprisingly, entitled *Anti-Lawyer Attitude Up* stated in part:

> AMERICANS' cynicism toward lawyers is growing, presenting a deepening image crisis for the legal profession.
>
> . . . .
>
> The findings support the widely held perception that resentment of lawyers—ranging from lawyer-bashing jokes to outright vilification—is running at a fever pitch. And it is especially high among better-educated, higher-wage earners in society.
>
> Although a slim majority of Americans, 52 percent, said their image of lawyers has stayed the same, a startling 36 percent said it has "gotten worse," and only 8 percent said it has "improved."

Randall Samborn, *Anti-Lawyer Attitude Up,* The National Law Journal, August 9, 1993, at 1.

The distillate of the above statistics, evaluations and conclusions, consonant with my own sense of the "public pulse," is that

the legal profession is in urgent need of rehabilitation. The venerable profession of the law is in need of a mass transfusion of public respect. The transfusion will not be immediate or certain, but certain it is that historically the profession has contributed greatly to the cherished values of our society, and the goal of helping to restore its rightful luster should be our commitment.

Although I regret the prospect of being viewed as unforgiving or uncaring, I am nevertheless compelled to withhold my approval from Mr. Birmingham's request for admission to practice law in the State of Nevada. I consider the denial of his admission, however difficult, better than the prospect of discretely promoting a deepening and foreboding public disrespect for the legal profession.

For the reasons noted above, I respectfully dissent.[1]

---

[1] I am not unaware of Mr. Birmingham's many positive accomplishments since the commission of his criminal offenses. Indeed, the number and the magnitude of his achievements have made the production of this dissent both reluctant and regrettable. Although I have strongly felt the need to dissent for what I perceive to be the good of the legal profession, I nevertheless again express confidence in Mr. Birmingham's rehabilitation, and in fact have good reason to believe that he will distinguish himself in the practice of law.