In re Daniel E. MANVILLE (No. 84–1362), Applicant.

In re Walter STRAUSS (No. 87–92), Applicant.

In re George L. BROOKS (No. 87–93), Applicant.

Nos. 84–1362, 87–92 and 87–93.

District of Columbia Court of Appeals.

Argued En Banc June 8, 1987.
Decided March 4, 1988.

Robert E. Jordan III, with whom Maureen O'Keefe Ward, Frank B. Stilwell III, and Laurie Genevro Cole, Washington, D.C., were on the brief, for petitioner Manville.

Walter Strauss, New York City, pro se.

Michael Millemann, Baltimore, Md., for petitioner Brooks.

Robert N. Weiner, Washington, D.C., was on the brief of amicus curiae, The Section on Courts, Lawyers and the Admin. of Justice of the District of Columbia Bar, joined by The Section on Criminal Law and Individual Rights of the District of Columbia Bar, for petitioners.

Randell Hunt Norton, Washington, D.C., was on the statement in opposition to brief of amicus curiae.

Carol Garfiel Freeman, Rockville, Md., with whom Lloyd N. Moore, Jr., Washing-ton, D.C., entered an appearance, for respondent, Committee on Admissions.

## ON HEARING/REHEARING EN BANC

Before PRYOR, Chief Judge, and MACK, NEWMAN, FERREN, BELSON, TERRY, ROGERS, and STEADMAN, Associate Judges.

BELSON, Associate Judge:

A common feature marks the backgrounds of the three applicants for admission to the bar whose cases are before us—each was convicted over a decade ago of a felony. Each of the three, Daniel E. Manville, Walter Strauss and George L. Brooks, attempts to overcome that obstacle to admission by demonstrating thorough rehabilitation over a period that extends ten years or more after their respective releases from confinement. This is Manville's second appearance before this court in connection with his bar application. A division of this court initially considered his application in *In re Manville*, 494 A.2d 1289 (D.C.1985) (hereafter *Manville I*), and remanded the case to the Committee on Admissions for its independent investigation of Manville's moral fitness for admission to the bar. After conducting an independent investigation of Manville's background, the Committee recommends, with one dissent, that Manville be admitted to the bar. We agree, and therefore accept the Committee's recommendation with respect to Daniel E. Manville. We also accept the Committee's recommendations and admit Walter Strauss and George L. Brooks based on their *ex parte* presentations to the Committee.[1]

### I.

In 1973, Daniel Manville pled guilty to a charge of voluntary manslaughter arising out of an incident that occurred in Decem-

---

1. We invited comment from the District of Columbia Bar and several voluntary bar associations on these applications for admission to the bar. On November 24, 1987, we granted the request of The Section on Courts, Lawyers, and the Administration of Justice of the District of Columbia Bar, joined by The Section on Criminal Law and Individual Rights of the District of Columbia Bar, to file a brief amicus curiae, time for filing a brief having expired. The brief supported the three applications. One member of the steering committee dissented.

ber 1972.[2] At that time, Manville was a college student who had been honorably discharged after three years of military service. Manville and his younger brother agreed to assist another student in recovering drugs and money believed to have been stolen by one Doug Edgar. Manville, his brother, and another person entered Edgar's apartment under the pretext of purchasing drugs, then threatened him with a gun and a knife. When two visitors arrived unexpectedly, Manville used chloroform to render Edgar and the visitors unconscious. One of the visitors died from an unusual reaction to the chloroform. Charged with murder, Manville entered a plea of guilty to manslaughter and received a sentence of from fifty-four months to fifteen years in prison. The sentencing judge later opined that he doubted that Manville had intended to kill anyone.

Following his criminal conviction, Manville has dedicated himself to improving himself and others. While in prison, he became a "jailhouse lawyer," completed his college education, and helped other inmates as an academic tutor and a co-counselor in a psychological therapy program. After his release on parole in 1976, Manville attended a paralegal training program, and then obtained a master's degree in criminal justice. Manville worked with a Head Start Program and with an anti-discrimination program. In 1979, Manville entered Antioch School of Law, where he served as a tutor, teaching assistant, and director of *The Prison Law Monitor.* Since law school, Manville has been employed by the American Civil Liberties Union's National Prison Project and has also revised and published a prisoner's litigation manual.

Several important events have occurred since the *Manville I* opinion. First, Manville has been admitted to the bar in Michigan, the state in which Manville committed the homicide, even though to date he has been unsuccessful in obtaining a pardon from the Governor of Michigan. Second, Manville's life history was thoroughly explored by a private investigator retained by our Committee on Admissions. That investigator interviewed about twenty-five people who had known Manville at various times in his life and examined all available records about Manville. A picture emerged of a man who, after a normal childhood, became involved in the drug culture and crime during his college years, but who since has demonstrated thorough rehabilitation. Those who have known Manville since his conviction, including the deputy wardens at the prison where Manville was incarcerated, almost uniformly describe Manville as dependable, honest, hard-working, trustworthy, and devoted to others. Only one person who has known Manville has opposed his admission to the bar: a landlord with whom Institutional Educational Services, a company for which Manville worked, had a rent dispute. The Committee heard testimony from the landlord and Manville concerning the dispute and determined that "the incident does not reflect adversely on Mr. Manville's character." Our review of the record confirms that the Committee's conclusion is supported by substantial evidence.

One Committee member dissented from the recommendation that Manville be admitted to the bar. He concluded that, given Manville's age (twenty-five) and experience (three years of military service, three years as a college student and a short time as a factory worker) at the time of the crime, as well as the seriousness of the offense, a longer period of time was necessary before the Committee could conclude that Manville's recent good conduct demonstrated good moral character.

George Brooks was raised by devoutly religious parents in a very strict atmosphere in a small Kentucky town. After he enrolled at the University of Kentucky, he experienced academic problems and had difficulties adjusting to the new environment. When he dropped a required course because he was doing poorly, he was reclassified as draft eligible and ordered to report for an induction physical.

---

**2.** Manville's background, the circumstances surrounding his commission of a crime, and his conduct thereafter, as reflected in the record then before the court, are discussed in detail in *Manville I, supra,* 494 A.2d at 1291–92.

Brooks apparently was unable to handle the stress. On May 21, 1970, he attempted to rob at gunpoint a bank located near his home. The record does not show how Brooks acquired the gun. He wore no disguise. He fired several inaccurate shots at an armed bank guard who returned the fire, seriously wounding Brooks. Brooks entered a guilty plea to a charge of attempted armed robbery and was sentenced to twenty years imprisonment. He served approximately seven years of his sentence before he was paroled in 1977.

Brooks had an outstanding record in prison and occupied himself with completing his education, helping others acquire high school equivalency diplomas, expanding the law library, and training other inmates to use it. Brooks was recommended for and received parole at the earliest possible date.

After he was paroled, Brooks finished his college education at the University of Kentucky and attended Antioch School of Law. Brooks did exceptionally well in college and law school and helped found a law journal at Antioch. He received excellent references from a clinical professor and the former dean of Antioch. Brooks also received consistently positive references from his employers. For over a year, Brooks has worked as a law clerk at the Bethesda, Maryland, law firm of Beckett, Cromwell & Myers.

Brooks has not been admitted to any other bars. On November 1, 1983, the Court of Appeals of Maryland declined to grant Brooks' application for admission to the Maryland Bar, finding that "the rehabilitative period following petitioner's release from prison in 1977 [was] of insufficient duration, considering the gravity of the offense committed." *In re Application of George B.*, 297 Md. 421, 466 A.2d 1286 (1983). The record does not indicate whether Brooks has reapplied to the Maryland Bar since that date.

The same Committee member who disagreed with the Committee's recommendation concerning Manville voted to exclude Brooks on the ground that Brooks had not been out of prison long enough to demonstrate his rehabilitation.

Walter Strauss was arrested ten times between 1959 and 1966 for offenses relating to his addiction to heroin and the criminal activities he used to support his habit. In 1962, Strauss acquired a felony conviction for the sale of narcotics and conspiracy to sell narcotics. Strauss served more than two years of imprisonment before he was paroled in 1965. In February 1966, Strauss was again convicted of narcotics distribution. This conviction was later vacated and the indictment was dismissed on the ground that Strauss was entrapped into committing the offense. Strauss served five years of his prison sentence before his conviction was reversed in 1971.

While he was in prison, Strauss acquired his high school equivalency diploma and completed several college courses. Following his release from prison, Strauss finished his college education and graduated with honors from Richmond College (CUNY) in 1974. Thereafter, Strauss obtained a master's degree from the John Jay College of Criminal Justice and his law degree from Rutgers University School of Law.

Strauss' employment since his release from prison has included working as a paralegal for The Fortune Society–Advocates for Penal Reform, as a teacher for Project S.H.A.R.E., an organization that provides life skills classes and remedial tutoring for ex-offenders, as a lecturer in criminology and criminal justice at Harlem College and the New School for Social Research, as a criminal justice consultant in the Essex County Probation Department, and as a consultant with the Vera Institute of Justice. Strauss began working as a law assistant to the judges in the Housing Division of the New York Civil Court in October 1984. As far as the record reflects, Strauss continues to work in that position. All of Strauss' previous employers have recommended him without qualification for admission to the bar.

In 1985, Strauss was admitted to the New York and New Jersey state bars. He was admitted to practice before the United States District Courts in the Southern and Eastern Districts of New York in August

1986, and in the United States District Court, District of New Jersey, in October 1985. Strauss has also applied for admission to the Florida Bar, but as of October 1985, the time of the last inquiry of record, that application was still pending, awaiting the restoration of Strauss' civil rights. The Committee on Admissions has unanimously recommended that Strauss be admitted to the bar.

## II.

We now reaffirm en banc the principles enunciated in *Manville I* for this court's evaluation of applications for admission to the bar of individuals who previously have been convicted of felonies. As we noted in *Manville I,* all the other jurisdictions of which we are aware have eschewed a *per se* rule of exclusion for previously convicted felons, opting instead for case-by-case determinations of whether the appli-

cant, as of the time of the application, has the good moral character necessary for admission to the bar. 494 A.2d at 1295 & nn. 9–10. Furthermore, because, under *Schware v. Board of Bar Examiners,* 353 U.S. 232, 246, 77 S.Ct. 752, 760, 1 L.Ed.2d 796 (1957), good character at the time of application is the appropriate test, a rule denying bar admission to all applicants who have felony convictions might contravene constitutional guarantees of due process or equal protection of the laws.[3] But it is not necessary for us to define the boundaries of constitutional rights in this area because we affirm our adherence to individualized determinations of the moral fitness of applicants to join the bar on policy, as distinguished from constitutional, grounds.

We also express our continued view that in cases where the applicant has committed a felony or other serious crime, the Committee ordinarily should arrange for an

---

**3.** Such a rule might be vulnerable to challenge on due process and equal protection grounds under Supreme Court authority invalidating irrebuttable presumptions that deny individuals important liberties or benefits. *See, e.g., Cleveland Board of Education v. LaFleur,* 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974) (irrebuttable presumption that pregnant teacher is physically incompetent to teach upon reaching fifth month of pregnancy violates due process clause); *Vlandis v. Kline,* 412 U.S. 441, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973) (irrebuttable presumption that student who applied to state university as nonresident of state remains nonresident for purpose of reduced tuition violates due process clause); *Carrington v. Rash,* 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 65 (1965) (state constitutional provision creating conclusive presumption that members of military services not residents of Texas before induction do not become residents of state for voting purposes during military service denies equal protection of laws). Similarly, such a rule might be found to be overinclusive and not sufficiently related to legitimate state ends to justify its use. *See City of Cleburne v. Cleburne Living Center, Inc.,* 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (zoning ordinance that requires special use permit for homes for mentally retarded but not for other "care and multiple dwelling facilities," as applied, deprives mentally retarded of equal protection of the laws because based on irrational prejudice against mentally retarded). As a treatise on constitutional law explains: "All the [Supreme] Court is really condemning when it invalidates an irrebuttable presumption, one may argue, is a substantive rule that it deems impermissibly overinclusive." L. TRIBE, AMERICAN

CONSTITUTIONAL LAW § 16–32, at 1094 (1978). It goes on to explain:

> [W]hen the Court strikes down a rule as fatally overinclusive, it *may* be suggesting that the state is forbidden to make *any use at all* of the factor that led to the rule's condemnation. The special feature of an invalidation employing the irrebuttable presumption doctrine is that it ordinarily suggests ... that the state may be free to use the factor *so long as it does not give that factor conclusive force.*

*Id.* at 1095 (emphasis in original) (footnote omitted). We are aware, however, that the Supreme Court has viewed with deference some arguably rational uses of the irrebuttable presumption approach. *See, e.g., Massachusetts Bd. of Retirement v. Murgia,* 427 U.S. 307, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976) (statute that requires a uniformed state police officer to retire at age fifty upheld as bearing rational relationship to state objective of maintaining physically fit police force); *see also Vance v. Bradley,* 440 U.S. 93, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979). Several lower federal courts have made similar rulings. *See, e.g., Darks v. City of Cincinnati,* 745 F.2d 1040, 1044 (6th Cir.1984) (refuses to strike down city's uniform practice of denying dance hall license to persons convicted of felonies); *Schanuel v. Anderson,* 708 F.2d 316, 318–19 (7th Cir.1983) (upholds constitutionality of statute that precludes ex-felons from working as security guards or private detectives within ten years of discharge of sentence). *But see Pentco, Inc. v. Moody,* 474 F.Supp. 1001, 1005–06 (S.D. Ohio 1978) (striking down municipal ordinance prohibiting ex-felons from obtaining license to operate massage establishments).

independent investigation of the applicant. *Manville I, supra,* 494 A.2d at 1294. We recognize that an investigation as thorough as the investigation of Manville will not always be required. But an independent investigation should be dispensed with only when the nature of the crime and the other surrounding circumstances, together with the other information concerning the applicant that comes to the Committee's attention, satisfy the Committee that an investigation would turn up no substantial adverse information. In the cases before us, it would have been preferable for the Committee to have made independent investigations of Strauss and Brooks as well as of Manville in light of the seriousness of the offenses Strauss and Brooks committed. The Committee risked causing additional delay to applicants in our consideration of their applications by failing to conduct independent investigations of their backgrounds. Although it is a close question whether the Strauss and Brooks cases should be remanded for further investigation, we are sufficiently satisfied by each applicant's *ex parte* showing of rehabilitation and good moral character to be able to accept the Committee's recommendation to admit them.

### III.

Applying the factors enumerated in *Manville I* for assessing the moral fitness of applicants whose backgrounds are tainted by criminal convictions, *id.* at 1296–97,[4] and giving deference to the factual determinations made by the Committee this court set up to screen applicants for bar admission, *id.* at 1293 and D.C.App.R. 46(a),[5] we find each of these applicants suitable for admission to the bar.

With respect to Daniel Manville, the Committee found as follows:

The evidence is overwhelming that today he is of good moral character. Witness after witness has attested to his possession of the essential qualities: a concern for the rights of others, a strong sense of fairness, trustworthiness and reliability, and a sincere dedication to the judicial process and the administration of justice. See *In re Manville, supra,* [494 A.2d] at 1298.

The lengthy record in this matter reveals Daniel Manville today to be a diligent, hardworking, conscientious, trustworthy man, totally devoted to assisting the underdog, specifically the inmates of the nation's prisons. Persons who wrote or testified on Mr. Manville's behalf during the initial proceedings have reaffirmed their belief that he is thoroughly rehabilitated. The independent investigation conducted by this Committee confirms this. Numerous witnesses, too, have testified to the sincerity of his remorse.... And it goes without saying that Mr. Manville has been completely candid with the Committee in disclosing his prior record, from his first application in 1981 to participate in the Law Students in Court program....

It is now more than ten years since Daniel Manville was released from pris-

---

4. The nonexhaustive list of those factors in *Manville I* comprised the following:
 1. The nature and character of the offenses committed.
 2. The number and duration of offenses.
 3. The age and maturity of the applicant when the offenses were committed.
 4. The social and historical context in which the offenses were committed.
 5. The sufficiency of the punishment undergone and restitution made in connection with the offenses.
 6. The grant or denial of a pardon for offenses committed.
 7. The number of years that have elapsed since the last offense was committed, and the presence or absence of misconduct during that period.

8. The applicant's current attitude about the prior offenses (*e.g.,* acceptance of responsibility for and renunciation of past wrongdoing, and remorse).
9. The applicant's candor, sincerity and full disclosure in the filings and proceedings on character and fitness.
10. The applicant's constructive activities and accomplishments subsequent to the criminal convictions.
11. The opinions of character witnesses about the applicant's moral fitness.

5. The Committee on Admissions is composed of seven members of the bar of this court with a wide range of legal backgrounds, including private practice and judicial and other government service.

on. We are persuaded that his rehabilitation is genuine and complete. The sincerity of his remorse has impressed not only his friends and business associates but the Committee investigator, Richard Thornton, and the members of the Committee who heard him testify. He is attempting to atone for his act by dedicating his life to improving the lot of prisoners. This strong commitment stems from his personal experiences, to be sure, but is unquestionably sincere and socially valuable. The unanimous opinion of those who know him is that he is dedicated to this goal and desires admission to the bar in order to better serve his chosen clients. The quality of his good works touches every aspect of his life, and includes neighborhood teenagers as well as acquaintances and friends.

In sum, we are convinced that the applicant has met his heavy burden of overcoming the presumption of bad character arising from his serious prior conviction and that Daniel Manville today is of good moral character. Therefore, we conclude that he meets the qualifications for admission to the Bar of the District of Columbia Court of Appeals and we certify his admission.

 We are satisfied that each of the Committee's determinations is amply supported by the record. At the same time, we observe that Manville does not have a flawless application for admission, even for one with a felony conviction. He has not, as far as the record reflects, made restitution to the victim's family. Nor has he been granted a pardon for his offense.[6] In the fourteen years since Manville committed his offense, however, he has demonstrated a remarkable and thorough rehabilitation. We are satisfied that he has met his burden of proving by a preponderance of the evidence[7] that he has overcome the serious misconduct of his past and is now sufficiently rehabilitated to be morally fit to practice law. *See Manville I, supra,* 494 A.2d at 1295–96 (evidence of past criminal conduct suggests unfitness unless rebutted). Therefore, we approve Daniel Manville's application for admission to the bar of this court.

We also accept the Committee's recommendation and admit George Brooks. The Committee found that Brooks' single criminal episode, the attempted armed robbery

6. While a pardon would strengthen an application such as Manville's, it is not, we recognize, a matter over which the applicant has control.

7. In *Manville I, supra,* 494 A.2d at 1294, we said the following about the burden of proof:

We point out that [District of Columbia Court of Appeals Rule 46] makes no distinction between applicants who have been convicted of a felony and other applicants. All applicants must prove their qualifications and fitness by a preponderance of the evidence. *See In re Heller,* 333 A.2d [401] at 402 [D.C. 1985]. At the same time, we recognize that to the extent that the reports of the Committee indicate that Manville has a heavy burden of persuasion, they are correct.

We added:

We merely recognize, and agree with the suggestion of the Committee, that applicant Manville has much to overcome in order to prevail by a preponderance of the evidence.

*Id.* at 1295. Consistent with the Committee's application of what it termed a "presumption" of bad character, as quoted above, we stated:

Of course, evidence of criminal convictions usually suggests unfitness and therefore should be considered in the overall assessment of an applicant's fitness to practice law.

Evidence of the applicant's reform and rehabilitation must also be taken into account.

Although an applicant's prior criminal conviction is not conclusive of a lack of fitness, "his burden of establishing his present good moral character takes on the added weight of proving his full and complete rehabilitation subsequent to the conviction." *Application of Davis,* 38 Ohio St.2d 273, 274, 313 N.E.2d 363, 364 (1974). As Justice Handler has observed, speaking for the Supreme Court of New Jersey in *In re Matthews* [94 N.J. 59, 81, 462 A.2d 165, 176 (1983)]:

The more serious the misconduct, the greater the showing of rehabilitation that will be required.... However, it must be recognized that in the case of extremely damning past misconduct, a showing of rehabilitation may be virtually impossible to make.

*Id.* at 1295–96 (footnotes omitted).

We reiterate that even though our rule describes the applicant's burden in terms of "preponderance of the evidence" rather than "clear and convincing" or "beyond a reasonable doubt," an applicant with a background of a conviction of a felony or other serious crime must carry a very heavy burden in order to establish good moral character.

of a bank, occurred when Brooks was emotionally immature. The Committee also found that Brooks has conducted himself commendably since that time, as evidenced by his prison, college, law school, and employment records. The Committee concluded that "[t]he evidence as a whole establishes that, Mr. Brooks' conduct was aberrational, and that he has been fully rehabilitated."

▉ The Committee's findings are supported by substantial evidence of record. His references describe Brooks as "careful, conscientious and able," having exemplary personal character, having the highest integrity, and having "exceptional" professional and ethical judgment. Many people who know Brooks described the single criminal incident in his life as an aberration in an otherwise unblemished record. We conclude that in the seventeen years since Brooks' offense, he has sufficiently demonstrated his moral character and fitness to practice law. *See In re G.L.S.*, 292 Md. 378, 439 A.2d 1107 (1982) (admitting bar applicant who, fourteen years earlier, was driver of getaway car in bank robbery).

Turning next to Strauss' application, the Committee's unanimous conclusion included the following findings:

> The criminal activities Mr. Strauss engaged in over twenty years ago were directly or indirectly associated with his narcotics abuse problem. Until he was 24, Mr. Strauss turned to a life of petty crime in order to support his drug habit; however, since 1966, Mr. Strauss has managed to overcome the drug related problems of his youth.

> The record indicates that Mr. Strauss was an exemplary inmate while incarcerated after his 1966 conviction. He used his time behind bars to improve himself and to assist his fellow inmates. Mr. Strauss completed the requirements to receive a high school equivalency diploma, and began college course work during his incarceration. After his conviction was overturned in 1971, Mr. Strauss entered Richmond College, from which he graduated with honors in 1974. Between 1974 and 1984, Mr. Strauss earned

a Master of Arts degree and the degree of Juris Doctor.

> Mr. Strauss has been employed in various legal and non-legal jobs since June, 1971. He has also been a lecturer on subjects related to Criminal Justice at various schools since 1978. His application is replete with recommendations from judges, attorneys, employers and other reliable persons attesting to Mr. Strauss' integrity, professionalism, and his high moral and ethical standards. As the Committee on Character and Fitness for New York stated in its report recommending Mr. Strauss for admission to that Bar, Mr. Strauss' activities since his release from prison in 1971 "reveal a steady course of the most remarkable rehabilitation." The evidence as a whole clearly establishes that Mr. Strauss has been fully rehabilitated. For these reasons, the Committee certifies his admission to the District of Columbia Bar.

▉ Our examination of the record indicates that the Committee's findings are amply supported in all respects. We share the Committee's view that Strauss is presently fit to practice law in the District of Columbia and therefore accept his application for admission. *See In re Application of A.T.*, 286 Md. 507, 408 A.2d 1023 (1979) (admitting applicant who, thirteen years previously, had been addicted to drugs and had been convicted of numerous offenses related to his drug habit; applicant never convicted of drug distribution).

## IV.

We have also considered whether *In re Kerr*, 424 A.2d 94 (D.C.1980) (en banc) is persuasive precedent in this case. In *Kerr*, this court held that pursuant to D.C.Code § 11–2503(a) (1973), any member of the bar of the District of Columbia Court of Appeals who is convicted of an offense involving moral turpitude must be permanently disbarred. This court found itself without statutory authority to reinstate an attorney convicted of such an offense unless that individual had received a pardon. *Id.* at 98.

▉ We are satisfied that this court can adopt a rule for the admission of applicants

who have committed felonies that differs from the rule it employs in connection with the application for readmission of a former attorney who was disbarred for committing a felony. This is so, first, because while D.C.Code § 11–2501(a) (1981) gives this court plenary authority over the original admission of attorneys to the bar, no statute gives it plenary authority over readmission cases. *Kerr, supra,* 424 A.2d at 98.[8]

There are other reasons why the bar should view crimes of moral turpitude committed by a lawyer more seriously than those committed by a lay person. The lawyer has a special duty as an officer of the court to uphold the law.[9] Every member of the bar of the District of Columbia Court of Appeals has taken an oath swearing to uphold the law.[10] For attorneys to ignore or flout their obligation to conduct themselves in conformance with the law is more reprehensible than similar conduct by lay persons because of attorneys' special obligations to uphold the law and protect the legal system. Although *Kerr*'s holding turns on the court's interpretation of the applicable statute, the recognition of the unique position occupied by a lawyer who has broken the law is implicit in the *Kerr* decision itself. *See id.* at 99 n. 18 (relationship of trust between attorney and court irrevocably shattered when attorney commits felony involving client's funds). *See also* D. Rhode, *Moral Character as a Professional Credential,* 94 YALE L.J. 491, 587 (1985) ("[V]iolations of the law assume a different symbolic dimension when committed by those sworn to uphold it.").

We find the available legal authority supportive of the distinction we draw here between members of the bar who are convicted of crimes of moral turpitude and bar applicants previously convicted of such crimes. Apparently, only one state, New York, has a mandatory, permanent disbarment provision similar to that of the District of Columbia.[11] Under New York law, any attorney convicted of a felony, "shall upon conviction, cease to be an attorney." N.Y.JUD.LAW § 90, subd. 4 (McKinney 1983). The courts in New York have the power to vacate or modify an order of disbarment only upon the reversal of a conviction or a pardon. *In re Sugarman,* 64 A.D.2d 166, 168, 409 N.Y.S.2d 224, 226 (1978).

We know, however, that New York has admitted some persons previously convicted of felonies to its bar. First, as noted above, Walter Strauss has been admitted to the Bar of New York, Second, in *In re Kesselman,* 100 A.D.2d 606, 606, 473 N.Y. S.2d 826, 827 (1984), an appellate division of the Supreme Court of New York made an advance ruling that the applicant's prior conviction of criminal sale of a controlled substance in the third degree would not operate to disqualify him on character grounds from being admitted to practice as an attorney in the state of New York.[12]

---

**8.** We do not reach the issue whether *Kerr* was correctly decided and should remain the law of this jurisdiction. That issue was not briefed by the applicants and was discussed only in the brief of an amicus. Moreover, as we. explain, *Kerr* is distinguishable and does not control our action on these applications.

**9.** *See* District of Columbia Code of Professional Responsibility EC 1–5 ("A lawyer ... should refrain from all illegal and morally reprehensible conduct. Because of his position in society, even minor violations of law by a lawyer may tend to lessen public confidence in the legal profession. Obedience to law exemplifies respect for law. To lawyers especially, respect for the law should be more than a platitude.").

**10.** That oath is contained in D.C.App.R. 46(h) and reads as follows: ·

I, _____ do solemnly swear (or affirm) that as a member of the Bar of this court, I will demean myself uprightly and according to law; and that I will support the Constitution of the United States of America.

**11.** Utah may have a permanent, mandatory disbarment statute also. Utah Laws § 78–51–37 (1987) provides for mandatory disbarment upon conviction of a felony or misdemeanor involving moral turpitude. Utah has no statutes or cases addressing whether previously disbarred attorneys may be reinstated. Utah also has no case law deciding whether exfelons may be admitted on an original application to become a member of the Utah Bar. Thus, Utah authority supplies no guidance here.

**12.** Criminal sale of a controlled substance in the third degree is a class B felony under New York law. N.Y.PENAL LAW § 220.39 (McKinney 1980 & 1987 Supp.).

*But see In re Roger MM*, 96 A.D.2d 1133, 466 N.Y.S.2d 873 (1983) (applicant's history of past criminal conduct, including convictions for bank robbery and first-degree murder, would disqualify him, on character grounds, from being admitted to practice law in state of New York).

Thus, the only jurisdiction other than the District of Columbia that disbars and precludes the readmission to the bar of all felons has adopted a more lenient rule for those previously convicted of felonies who apply for the first time for admission to the bar.[13] All other states appear to allow even attorneys who are disbarred for the conviction of one or more felonies to apply for readmission after a number of years, and to be readmitted if deemed morally fit at that time. *See, e.g.*, ARIZ.SUP.CT. R. 41 (applicant reinstated when rehabilitated only after two years from date of disbarment); ILL.SUP.CT. R. 767 (disbarred attorney must wait five years before filing a petition for reinstatement); MO.ANN.STAT. § 484.270 (Vernon 1987) (disbarred attorney may apply for reinstatement after one year); N.M.SUP.CT. R. 17–214 (disbarred attorney may, with supreme court approval, apply for reinstatement more than three years after effective date of disbarment); R.I.SUP.CT. R. 42–16 (person who has been disbarred cannot apply for reinstatement for five years).

In sum, there are three major reasons why we reject a *per se* rule excluding former felons from the District of Columbia Bar. First, every state that has considered this issue has eschewed such a *per se* rule. Second, this court has plenary authority over bar admissions; therefore, we can adopt the rule we find most appropriate. Because we believe that a few persons who have been convicted of felonies may become sufficiently rehabilitated to meet the demanding ethical requirements of the legal profession, we prefer individualized determinations of present moral fitness to an overinclusive categorization ex-

cluding all previous felons. Finally, we hold that these cases, involving as they do matters of policy, are distinguishable from the issue of statutory construction presented in *In re Kerr*, and we therefore decline either to revisit *Kerr* or to extend its rationale to initial applications for admission.

Accordingly, we approve the applications of Daniel Manville, George Brooks, and Walter Strauss for admission to the bar of this court.

*So ordered.*

FERREN, Associate Judge, with whom ROGERS, Associate Judge, joins, concurring:

I join in Judge Belson's opinion for the court, except for Part IV. Judge Belson attempts—as well as anyone could—to demonstrate why admission of someone to the bar who has been convicted of a felony is not inconsistent with the law requiring permanent disbarment of a lawyer who has been convicted of a crime involving moral turpitude. I believe, however, that the distinction is strained. I have difficulty with the idea that a lawyer has a higher obligation than a lay person not to violate the law. But, even if there is merit to that idea, I do not believe it should serve, in any way, to justify admission of a convicted felon to the bar when public policy holds—as it does in the District of Columbia—that the same person, if convicted of the same crime after admission, would have to be disbarred permanently. I believe the same policy, whether eligibility to apply (or reapply) for a lawyer's license, or permanent ineligibility to practice law, should apply in both situations.

I have no difficulty with approving the admissions of Messrs. Manville, Strauss, and Brooks, however, because I believe this court's interpretation of the so-called permanent disbarment statute, D.C.Code § 11–2503(a) (1981), is wrong. *See In re Kerr*, 424 A.2d 94 (D.C.1980) (en banc). As

---

**13.** At least one other state, South Carolina, does not allow persons who have been disbarred to apply for readmission, but leaves the sanction for all forms of misconduct to the discretion of its state supreme court, rather than automatical-

ly disbarring all attorneys who are convicted of felonies. *See, e.g.*, S.C.CODE ANN. § 40–5–520 (Law.Co-op. 1976); S.C.CODE ANN.DISCIPLINE R. §§ 5, 6.

I tried to demonstrate a number of years ago, that statute does not preclude an application for reinstatement. *Id.* at 99 (Ferren, J., dissenting).[1] Thus, I conclude that, upon a proper showing of rehabilitation—which I believe should be a very high hurdle—one convicted of a crime involving moral turpitude is eligible for admission to the bar or for readmission after disbarment, as the case may be.

On the record before us, I am satisfied that Messrs. Manville, Brooks, and Strauss have demonstrated the necessary rehabilitation, as well as a present fitness for the practice of law, to justify their admission to the bar.

NEWMAN, Associate Judge, dissenting:

If these persons had been admitted to practice when they committed their crimes, they would have been permanently disbarred. D.C.Code § 11–2503(a) (1981), *In re Kerr,* 424 A.2d 94 (D.C.1980) (en banc). Like my Brother Ferren, "I believe the same policy, whether eligibility to apply (or reapply) for a lawyer's license, or permanent ineligibility to practice law, should apply in both situations," *supra* at 1137. Unlike my Brother Ferren, however, I think *Kerr* was and still is correctly decided. I think this court's ruling today disserves, indeed sullies the legal profession. I dissent.

1. *See also In re Wolff,* 511 A.2d 1047 (D.C.1986) ("Several members of the court would reconsider the permanent disbarment holding in *In re Kerr,* 424 A.2d 94 (D.C.1980) (en banc).").

1. Associate Judge Nebeker was a member of the court at the time of oral argument. His status changed to Associate Judge, Retired, on September 1, 1987, and he left the court on December 11, 1987. Before his departure, he noted his concurrence in this opinion.

2. Originally charged with murder, Manville was convicted of the lesser included offense of manslaughter as a result of a plea bargain.

3. There is no need here to define the outer limits of what I refer to as a "serious crime." As that term applies to suspension and disbarment cases, however, it is defined in Rule XI, § 15(2), of our Rules Governing the Bar. *See*

TERRY, Associate Judge, dissenting:[1]

A majority of the court today has decided to admit to our bar three persons who have been convicted of a homicide,[2] attempted armed robbery of a bank, and felonious sale of narcotics. I cannot in good conscience join in that decision; accordingly, I dissent.

When the *Manville* case was initially before us, I joined with Judge Nebeker in his statement of reasons for voting *sua sponte* to rehear the case en banc. *In re Manville,* 494 A.2d 1289, 1298 (D.C.1985). I still agree with the views expressed then by Judge Nebeker. I shall not restate those views here, but shall confine my observations to what the majority has done today.

Accepting for the sake of argument the majority's assumption that we cannot adopt a *per se* rule excluding any convicted felon from our bar, I would nevertheless hold that a prior conviction of certain serious crimes (which would certainly include the crimes of which Manville, Strauss, and Brooks were convicted) raises a presumption of bad moral character.[3] I would further hold that an applicant for admission to the bar must overcome that presumption by clear and convincing evidence (not merely a preponderance of the evidence, as the majority seems to conclude, *ante* at 1134 n. 7) before he or she may be considered for admission to the bar. I do not believe that these three applicants have met that burden of proof, and I would deny their applications for admission.[4]

*generally In re Hutchinson,* 474 A.2d 842 (D.C. 1984). The definition in that rule would not necessarily apply in a case such as this, involving an applicant for admission, but it would at least provide a starting point for discussion.

4. I recognize that such a burden may be difficult to meet, but that is no reason to lighten it. The Supreme Court of New Jersey has spoken on this point:

An applicant's attitude and behavior subsequent to disqualifying misconduct must demonstrate a reformation of character so convincingly that it is proper to allow admission to a profession whose members must stand free from all suspicion.... The more serious the misconduct, the greater the showing of rehabilitation that will be required.... However, it must be recognized that in the case of extremely damning past misconduct, a show-

Randell Hunt Norton, Esquire, has filed a "Dissenting Statement in Opposition to Brief *Amicus Curiae* [of two sections of the District of Columbia Bar] in Support of Application to the Bar of Three Convicted Felons." In his dissenting statement, Mr. Norton writes:

> The bar admissions process is not ... akin to the penal system where rehabilitation is one of the primary interests. The admissions process is aimed at selecting not only those persons who will honestly and competently handle their clients' interests, but also those persons who will not diminish respect for the legal profession as an institution.... Certainly the crimes involved here, murder, attempted armed robbery, and drug sales, are precisely the type of crimes which are serious enough to engender such public repugnance that admitting a person convicted of such a crime would seriously damage public confidence in the bar.

I agree with these sentiments, and I share Mr. Norton's distress about the damage that the admission of these three applicants will inflict on what he describes as the "honored and honorable profession" of attorneys. I fear that the action of the majority today has placed an indelible stain on the integrity of the District of Columbia Bar and on the entire legal profession.[5]

I respectfully dissent.

---

ing of rehabilitation may be virtually impossible to make.

*In re Matthews,* 94 N.J. 59, 81, 462 A.2d 165, 176 (1983) (citations omitted).

**5.** I note with dismay the seeming indifference of most of the organized bar to these cases. Before oral argument, the court entered an order inviting "any sections or committees of the District of Columbia Bar," as well as six voluntary bar associations, to file *amicus curiae* briefs. None of the voluntary bar associations responded, and only two of the twenty sections of the unified Bar filed a brief; the other eighteen remained lamentably silent.