**In re Walter BLAIR, Applicant.**

**No. 91–SP–699.**

District of Columbia Court of Appeals.

Argued Jan. 6, 1992.

Decided Sept. 18, 1992.

---

Blaine A'mmon White, Baltimore, Md., with whom Sandy V. Lee, Washington, D.C., was on the brief, for applicant.

Charles L. Reischel, Washington, D.C., for the Committee on Admissions.

Before STEADMAN and KING, Associate Judges, and BELSON, Senior Judge.

KING, Associate Judge:

Walter Blair, having passed the bar examination in 1987, is an applicant for admission to the Bar. Because adverse information regarding his fitness to practice law was presented to the Committee on Admissions ("the Committee"), it held hearings to determine whether Blair should be admitted to the Bar. At the conclusion of those hearings, the Committee was evenly divided on whether to recommend admission. We have reviewed the record, and we conclude that a remand is necessary since the recommendations provided by the Committee are insufficient to permit us to determine whether Blair has met his burden of showing that he possesses the requisite moral character and fitness to practice law in the District of Columbia as required by D.C.App.R. 46(e).

I.

Blair graduated from law school in 1979 and was admitted to the Bar in West Virginia in 1980. He did not, however, begin the actual practice of law in that state until late spring of 1981. In the interim, Blair worked with attorneys in Maryland and the District of Columbia and appeared in the courts of those jurisdictions *pro hac vice.* Blair's conduct in one of the cases in Mary-

land lead to a suspension from the practice of law by the West Virginia Supreme Court of Appeals in 1985. He has never been reinstated to that state's Bar, nor has he ever been admitted as a member of the Bar in any other jurisdiction.

Beginning in April, 1985, after his suspension, Blair began working with W. Edward Thompson, an attorney in the District of Columbia and principal in a succession of law firms located in the District. Cases that Blair had before his suspension were transferred to Thompson as formal counsel. In September, 1987, the last Thompson firm with which Blair worked, Thompson, Lee & Harvey, dissolved. Blair then went to work for Lee & Harvey.

In 1987, Blair passed the Bar examination for the District of Columbia. In his application for admission to the Bar here, he disclosed his suspension from the practice of law in West Virginia and the fact that he has never been reinstated. In addition, W. Edward Thompson alleged that Blair had contributed to the break-up of Thompson's firm by encouraging former members of the firm to "steal" Thompson's clients.

A hearing was held in May, 1988, to investigate the circumstances of the West Virginia suspension and Thompson's allegations to determine the effect, if any, either would have upon Blair's application to practice law in the District of Columbia. After the 1988 hearing, the Committee unanimously concluded that neither Blair's suspension in West Virginia, nor the allegations concerning the break-up of the Thompson law firm constituted a sufficient basis for denying him admission. However, at the 1988 hearing, in addition to presenting evidence regarding the break-up of the law firm, Thompson also testified that Blair had engaged in the unauthorized practice of law in the District of Columbia after he was suspended in West Virginia. As a result, subsequent hearings were held in February and March of 1990 to investigate the new allegation. After the conclusion of the 1990 hearings, the Committee was divided evenly on whether to recom-

mend Blair's admission to the District of Columbia Bar.

## II.

### A.

The Committee began by reviewing Blair's conduct as a practicing attorney. Although Blair was admitted in West Virginia only, he worked with attorneys in Maryland and the District of Columbia and appeared *pro hac vice* in a number of cases.[1] In 1981, while handling one of his Maryland cases, Blair engaged in conduct which was later determined to be witness tampering. The witness tampering incident was the cause of Blair's suspension by the West Virginia Supreme Court of Appeals in 1985.[2]

### B.

Blair's conduct as an attorney in matters unrelated to the witness tampering incident also raised concerns. For example, Blair's conduct during the course of his representation of a defendant in a criminal proceeding led to a separate charge of obstruction of justice against him. Blair was convicted by a jury after one trial, but that conviction was set aside by the trial court. At a second trial, he was acquitted.

Just prior to being indicted in that case, Blair filed a civil action, seeking fifteen million dollars in damages, against the local prosecutor and others, alleging malicious prosecution, intentional infliction of emotional distress, negligence and other claims with respect to their role in the prosecution of him for obstruction of justice. After his acquittal, Blair pursued that claim. The trial court directed verdicts in favor of two of the defendants and the jury found in favor of the third. The trial judge then assessed attorney fees against Blair for bringing baseless claims. *Blair v. Hamstead*, No. 82–28–M (N.D.W.Va. Dec. 4, 1984) (order of Merhige, J., awarding attorney fees).

Attorney fees were also assessed against Blair as a result of an unfounded suit brought by him against the Shenandoah Women's Center. In that case, Blair sued the Shenandoah Women's Center after his client's wife sought shelter there for herself and her children from her husband's abuse. *Blair v. Shenandoah Women's Center, Inc.*, 757 F.2d 1435, 1436 (4th Cir. 1985). Blair asserted that the shelter had no right to shelter his client's wife and children against the husband's wishes and brought claims of " 'Discrimination Based on Sex, Conspiracy False Arrest, Malicious, Prosecution, Assault and Battery, Negligence, Defamation of Character, Intentional Infliction of Emotional Distress, and Harrassment [sic]' " in an effort to obtain ten million dollars in damages, attorney fees and injunctive relief. *Id.* The district court dismissed the complaint and imposed attorney fees on Blair and his client. *Id.*

The United States Court of Appeals for the Fourth Circuit, in affirming the imposition of sanctions, observed:

> Several defendants were sued without any explanation why. No allegations were made to support a race discrimination claim. Scandalous and irrelevant allegations were made about the personal lives of Shenandoah's employees.
>
> All defendants moved to dismiss for failure to state a claim. Blair then filed motion after motion for extensions of time and for leave to amend the complaint, though no new complaint was ever tendered. Meanwhile, he neither

---

1. Blair testified that immediately prior to his suspension, he had about 100 cases in West Virginia and from fifty to sixty cases in the Washington, D.C. metropolitan area.

2. The West Virginia Supreme Court of Appeals imposed a six month suspension and required Blair, for three years following the suspension, to confine his practice to West Virginia and to locate a West Virginia attorney who was acceptable to the court and willing to assume com-

plete responsibility for Blair's conduct. Blair was unable to locate an attorney acceptable to the court. His inability to meet the requirement was found by the Committee to be irrelevant to whether Blair should be admitted here based, in large part, upon testimony of the late Wiley Branton, Dean of the Howard University School of Law, who testified that Blair's difficulty in securing a practice monitor was likely the result of lingering vestiges of racist sentiments.

responded to defendants' discovery nor conducted any discovery of his own. Eventually the district court heard the motion to dismiss, at which time Blair argued his case in a way suggesting that he had not researched the legal issues at all. The district court granted defendants' motion to dismiss, and suggested a hearing on attorneys' fees.

\* \* \* \* \* \*

The district court found a seven-page litany by Shenandoah detailing [Blair's client's] and Blair's misconduct to be 'candidly expressed and factually accurate.' It accordingly incorporated these factual findings into its order imposing attorneys' fees. The findings refer to [Blair's client's] and Blair's 'obvious bad faith' in filing the complaint, their 'dilatory tactics', their 'frivolous' legal positions, and their 'scandalous' accusations.

*Id.* The court concluded that the evidence before the trial court established that Blair acted in bad faith, and therefore affirmed the award against Blair pursuant to 28 U.S.C. § 1927 and the inherent power of the court under *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980). *Id.* at 1438.[3]

### C.

On the issue of Thompson's allegations against Blair regarding the break-up of the Thompson law firm, the Committee found that "none of the things complained of by Mr. Thompson concerning the break-up of [his firm] raises sufficient grounds for precluding Mr. Blair's admission to the Bar of this Court." The Committee noted that Bar Counsel found no evidence of misconduct and that civil actions filed by Thompson, which were prompted by the break-up, "have not resulted in any findings of wrong-doing on the part of [Blair]."

### D.

The Committee also gave consideration to whether Blair had been completely truthful with the Committee. That issue arose under the following circumstances. In May, 1988, the Committee concluded its hearing investigating Blair's suspension and his role in the break-up of the Thompson law firm. During the course of that hearing, Thompson claimed that Blair, while he was suspended, engaged in the unauthorized practice of law. Because of Thompson's allegation, the Committee requested Blair's income tax records for the years 1982—1987. These records revealed that although Blair was suspended beginning in April, 1985, he received nearly the same gross income (and claimed the same deductions) in 1985 as in 1984, the last full year of his practice. The Committee wrote Blair expressing concern that he may have been involved in improper fee-splitting and the unauthorized practice of law after his suspension. The correspondence concluded by requesting that Blair provide whatever response he wished to make.

Over the next several months Blair submitted a series of affidavits attesting that during 1985 he was paid by Thompson at a rate of forty dollars an hour and that the bulk of his 1985 income was in the form of salary from the Thompson firm. In 1990, when the Committee held additional evidentiary hearings, it heard testimony from employees of the firm that the money Blair received in 1985 was not salary. There was testimony that Blair received a portion of fees from cases as they were settled by the firm and that the payments received by him were reimbursement for work he had done on those cases after his suspension.[4] Bank records of the firm subpoenaed by the Committee supported this testimony.

Blair testified, in direct contradiction to his earlier affidavits, that the money re-

---

**3.** All the activity in the trial court occurred before the 1983 amendments to Fed.R.Civ.P. 11 which empower a trial judge to award sanctions, including attorney fees, for dilatory or abusive tactics or for the filing of unfounded claims.

**4.** In addition to testimony regarding Blair's source of income, witnesses offered testimony that his role in the firm had many of the attributes of an attorney in the active practice of law. In response, Blair introduced testimony showing the bias of those who had testified to his apparent fee-splitting and unauthorized practice.

ceived by him in 1985 from Thompson was *not* salary. Instead, he testified, the money was "quantum meruit" payment for work done by him, prior to his suspension, on his own cases that were transferred by him to Thompson after he was suspended. As these cases settled in 1985, Blair claimed, he was paid out of the proceeds on a "quantum meruit" basis for the work he had done as an attorney before his suspension. He also testified that most of the money he received in 1986 was salary for work performed for the Thompson firm.

### III.

■ In order to be admitted to the Bar in this jurisdiction, an applicant must establish, by a preponderance of the evidence,[5] that he or she is a person of good moral character. *In re Demos,* 579 A.2d 668, 673 (D.C.1990) (en banc). Ordinarily, the recommendation of the Committee is accorded deference; however, even in those cases where this court does not adopt the Committee's ultimate recommendation, we nonetheless accord great deference to the Committee's factual findings and in particular to those findings based upon an assessment of a witness's credibility. *In re Manville,* 494 A.2d 1289, 1292–93 (D.C. 1985). Finally, regardless of the degree of deference accorded the Committee's conclusions, this court must ultimately determine whether an applicant should be admitted. *In re Baker,* 579 A.2d 676, 680 (D.C.1990).

Our review of the record reveals that the Committee, or at least some members of the Committee, considered six distinct areas to be relevant to the determination of whether Blair established the requisite moral character for admission to the Bar. The areas considered were: (1) the circumstances of Blair's suspension from the West Virginia Bar and his inability to obtain reinstatement; (2) his role in the dissolution of the Thompson law firm; (3) his

conduct as an attorney in the two cases in which attorney's fees awards were made against him; (4) whether he engaged in the unauthorized practice of law; (5) whether he was a party to improper fee splitting; and, (6) whether he was truthful with the Committee during its inquiry.

■ As we noted previously, the Committee unanimously concluded that Blair's suspension in West Virginia should not prevent his admission to the Bar of the District of Columbia. We find no basis for ruling otherwise. The Committee concluded that the conduct that prompted the suspension, while serious, was an insufficient basis for denying admission. This conclusion was based, in part, on the length of time that had passed since the incident, the fact that the incident was the product of inexperience and immaturity, and the fact that Blair recognized the impropriety of his conduct. In addition, the Committee, quite properly, accorded significant weight to the testimony of the widely respected, late Dean Wiley Branton regarding Blair's inability to obtain reinstatement to the Bar of West Virginia.[6]

■ The Committee also unanimously concluded that Blair's role in the break-up of the Thompson law firm should have no bearing upon his admission to the Bar. We agree with that conclusion for the reasons stated previously.

With respect to the remaining areas of inquiry, (1) Blair's conduct as a litigator (other than that which lead to his suspension) while a member of the West Virginia Bar, (2) the allegation of unauthorized practice of law in 1985 and 1986, (3) accusations of improper fee-splitting, and (4) whether Blair was truthful with the Committee, we do not have a sufficiently clear record from which to determine whether any one, or all together, should preclude Blair's admission

---

5. Effective August 1, 1989, the burden of proof became clear and convincing evidence. *In re Demos, supra,* 579 A.2d at 673, n. 8. Because Blair submitted his application prior to that date, the standard he must meet is preponderance of the evidence. *Id.* at 673.

6. See note 2, *supra.* While Dean Branton's testimony provided insight regarding Blair's experience in West Virginia, the same was not true regarding Blair's activities in the District of Columbia. Dean Branton testified that he knew nothing about the nature of Blair's work in the District.

to the Bar. As we observed in *In re Manville:*

> "[G]ood moral character" is "of broad dimension and ... can be defined in many ways." ... Although the term escapes precise definition it does, nevertheless, possess a core meaning. As Justice Frankfurter stated:
>
>> [A]ll the interests of man that are comprised under the constitutional guarantees given to "life, liberty, and property" are in the professional keeping of lawyers.... From a profession charged with such responsibilities there must be exacted those qualities of *truth-speaking,* of high sense of honor, of granite discretion, of the strictest observance of fiduciary responsibility, that have throughout the centuries, been compendiously described as "good moral character." [*Schware v. Board of Bar Examiners,* 353 U.S. 232, 247 [77 S.Ct. 752, 760, 1 L.Ed.2d 796] (1957) (Frankfurter, J., concurring)].

494 A.2d 1289, 1297–1298 (D.C.1985) (en banc) (citations omitted) (emphasis added).

As noted previously, the Committee was evenly divided in its recommendation. The three members recommending admission joined in a single report ("the three member report"). Of the three who opposed admission, two joined in one report ("the two member report"), and the third member wrote separately ("the single member report"). Only the last considered each of the four remaining issues set out above.

In contrast, the two member report made formal findings only on the issues of unauthorized practice of law and improper fee-splitting. That report also questioned Blair's veracity in his dealing with the Committee; however, there was no finding of whether Blair wilfully deceived the Committee, nor the consequences such a deception, if there was any, should have upon his application. Finally, the two member report does not address the two instances when Blair was assessed attorney's fees,

nor the effect this issue should have, if any, upon his fitness to practice law.

■ The three member report reached a conclusion on three of the four remaining issues;[7] but with respect to two, and possibly all three, of those issues, it applied an improper standard of proof. On the issue of whether Blair had been truthful with the Committee, for example, the report acknowledged that Blair gave conflicting stories regarding the source of his income during 1985 and 1986, and the members agreed that Blair may have been "deliberately attempt[ing] to mislead or deceive the Committee" with his original explanation regarding the source of his income. However, the three members did not resolve this issue by making any findings of fact based on the evidence presented. Instead, they "[gave] the Applicant the benefit of the doubt" in concluding "that he did not deliberately try to mislead or deceive the Committee."

Blair, because he was the applicant, should not have been afforded "the benefit of the doubt" on this crucial issue. The proper standard that must be applied is a standard that places the burden upon the applicant to show by a preponderance of the evidence that he is a person of good moral character. D.C.App. R. 46(e). The same standard necessarily applies when an applicant seeks to convince the members of the Committee that he has the requisite honesty to be admitted to the bar.

■ We also note that the same three members concluded there was no "clear and convincing evidence" that Blair was involved in fee-splitting. "Clear and convincing evidence" of wrongdoing, the burden of proof placed upon Bar Counsel in disciplinary matters, was an improper standard to apply. An applicant to the Bar does not enjoy the presumptions accorded a member of the Bar in a disciplinary proceeding. Under D.C.App. R. 46(e), the applicant had the burden of proving by a preponderance of the evidence that he should be admitted. Similarly, the three member report concluded the record does

---

7. The members gave no consideration to the possible effect upon Blair's application of his conduct in the two cases where attorney's fees were awarded against him.

not support a finding that Blair engaged in the unauthorized practice of law. Again, as we have noted above, the burden was on Blair to establish his fitness to practice law.

We appreciate that a substantial amount of time and effort was expended by the members of the Committee in reaching the recommendations provided to the court. Unfortunately, we are unable to make our judgment on this record since crucial questions remain unanswered regarding Blair's credibility and the effect the four issues discussed above, have upon his fitness to practice law. Therefore, we must remand the application to the Committee for clearer findings of fact and more detailed recommendations with respect to each of the four issues so that we can decide the ultimate legal question: whether the applicant should be admitted to the bar.[8]

Accordingly, we remand the application to the Committee on Admissions with directions to reconsider it in light of what we have said in this opinion.

*So ordered.*

---

**8.** We are aware that two members of the Committee who participated in the preparation of the recommendations have since been replaced.

Portions of the hearing may have to be reopened; however, we will leave that determination to the judgment of the Committee.