**In re Walter L. BLAIR, Applicant.**

**No. 91–BG–699.**

District of Columbia Court of Appeals.

Argued Sept. 14, 1995.

Decided Oct. 12, 1995.

prior testimony is or may be admissible under some exception to the hearsay rule.

Walter L. Blair, pro se, and Sandy V. Lee, Washington, DC, for applicant.

Charles L. Reischel, Washington, DC, for the Committee on Admissions.

Before FERREN, FARRELL, and KING, Associate Judges.

PER CURIAM:

In *In re Blair*, 614 A.2d 523 (D.C. 1992) (*Blair I*), the court remanded this matter to the Committee on Admissions for more detailed findings of fact and recommendations as to specific issues bearing on Blair's fitness for admission to the Bar. After conducting additional hearings, the Committee unanimously recommended against admission. While this court must ultimately determine for itself whether an applicant should be admitted, *In re Baker*, 579 A.2d 676, 680 (D.C.1990), "we nonetheless accord great deference to the Committee's factual findings and in particular to those findings based upon an assessment of a witness's credibility." *Blair I*, 614 A.2d at 527 (citing

*In re Manville*, 494 A.2d 1289, 1292–93 (D.C. 1985)). Assessment of Blair's credibility was critical for the Committee, as it found repeated indication that he had not been candid with it in his testimony. *See In re Demos*, 579 A.2d 668, 672 (D.C.1990) (en banc) (refusing admittance, relying partly on fact that Mr. Demos "had not been honest and forthright in his testimony before the Committee" and on his "lack of candor before the New Mexico court").

■ We reject Blair's application for admission substantially for the reasons set forth by the Committee. Blair has not borne his burden of establishing by a preponderance of the evidence [1] that he possesses the moral character and fitness to practice law in the District of Columbia required by D.C.App.R. 46(e) (1995). We deal here primarily with Blair's multifarious procedural challenges to the fairness of the Committee's findings and recommendation; though we do not discuss every one, we have considered and reject all of them.

■ Blair first argues that no quorum of the Committee participated in the original 1990 hearings and the 1993 post-remand hearings or in the 1994 findings and recommendation. There is no requirement that an identical quorum participate in all proceedings over a four-year period of time, nor would that ever be likely to happen.[2] What matters is that a quorum of the Committee (Kelly, Fort,[3] Nettler, and Moore) participated in the post-remand hearings and the 1994 findings and recommendation.

■ Second, Blair complains that the Committee failed to provide him with notice

that his allegation of drug use by his brother-in-law, Mr. Martin, was to be an issue in the hearing. In the 1990 proceedings Martin had refused to endorse Blair's admission. In an effort to discredit Martin, Blair noted in his 1991 opposition to an earlier report of certain Committee members that the witness "at the time was experiencing certain major medical difficulties related to chemical dependencies which may have clouded his judgment." (This did not prevent Blair from relying on significant portions of his brother-in-law's "incoherent" and "bizarre" testimony in his opposition.) The Committee viewed the Martin incident "as a continuation of Blair's practice of asserting scandalous personalized allegations against those who do not support him."

Blair's present objection confuses "issues" with questions. The Committee was not required to give him notice of every question they might ask him. The underlying issue was Blair's conduct and candor, and allegations such as he made against Martin, if unfounded, were relevant to that inquiry. The focus of the question about the Martin allegation was on whether Blair's judgment in making unsubstantiated accusations had improved.[4] Furthermore, after the September 14, 1993 hearing, Blair was on notice that the allegation raised a question and could have prepared to address it at the September 20, 1993 hearing.

Third, Blair similarly submits that he received no notice that a letter he sent to Bar Counsel and the Committee through his attorney accusing Ms. Dowe, an attorney in the Office of the Corporation Counsel, of misuse of her government position and blackmail

---

1. As Blair's application antedates August 1, 1989, he is subject to the lesser standard of proof. *See Blair I*, 614 A.2d at 527 n. 5.

2. This court recognized in *Blair I* that two members who participated in the original recommendation had been replaced and would *not* be participating in the remand. 614 A.2d at 529 n. 8. Contrary to Blair's strained reading of the footnote, the court was simply noting the fact that additional hearings might be necessary for the benefit of new Committee members. Thus, the court was aware that there could be no identical quorum from start to finish in this case.

3. Blair objects that Fort was not present at the September 14, 1993 hearing. He did not object

at that time or at the subsequent hearing, however, to her taking the hearing on the record. Judge Kelly was a holdover member of the Committee, D.C.App.R. 46(a), at the time of decision and issuance of the Committee's recommendation.

4. Blair's judgment in this regard apparently still has not improved. During the 1993 hearings, Blair accused Committee member Reischel of inviting Mr. Martin to his office and "tell[ing Mr. Martin] all kinds of improprieties about [Blair] and that [he] w[as] after [Blair]," an accusation Blair repeats in his brief.

would be a matter of inquiry, and further that there was no "evidence to support Mr. Reischel's claim ... against Mr. Blair," [5] *i.e.,* that Blair's allegation was bogus. Again, whether Blair made unsubstantiated allegations was relevant to Blair's character and his candor with the Committee, a fact he certainly knew was at issue in the hearings. Blair was questioned about the Dowe letter for some eight transcript pages at the hearing and, while professing little memory of its contents, admitted "there must have been some discussion" about it with his counsel at the time it was sent. There is no support for his claim that the Chair, Judge Kelly, ruled the entire Dowe matter out of bounds at the hearing only to have it emerge as a "negative finding" in the Committee's recommendation.[6] The Committee found that the Dowe letter was a further instance of Blair's making baseless personal accusations. The Committee had a sufficient basis on which to reach that conclusion.

■ Fourth, Blair disputes the Committee's findings with respect to his motion to disqualify Member Speights and its refusal to allow Blair's expert to testify regarding the motion's merit. The Committee found this a telling instance of Blair's "launching an all out personal attack" on his perceived opponents. Blair's notice argument here is no stronger than his previous ones.[7] And there is nothing to his claim that Committee member Reischel's questioning "coerced" him into testifying after Blair insisted he had had nothing to do with the recusal pleading and that Reischel should have been questioning Blair's counsel, who filed it. Blair asserts that he was being honest in testifying that he knew nothing about the pleading, hence that it sheds no light upon his credibility. But the Committee was in the best position to

determine Blair's credibility, and we will not disregard its reliance on the recusal motion, as it was not clearly erroneous.[8]

■ Fifth, Blair challenges as an abuse of discretion the Committee's finding that he has a "history of eng[a]ging in witness tampering" and a "willingness to submit pleadings containing highly inappropriate personal attacks." While the finding of a "history" of witness tampering, supported by only one proven incident—the Maryland case—may go too far, any exaggeration in this regard was harmless because past witness tampering played only a minor role in the Committee's recommendation. It rested instead primarily upon his practice, past and present, of "asserting improper personal attack[s] and making inappropriate allegations against others," and upon his lack of candor with the Committee.

Sixth, in keeping with his penchant for accusations against those who oppose him, Blair asserts that the Committee's findings with respect to his character and conduct amount to "impermissible discrimination," *i.e.,* "disciplining a black individual more harshly than a comparable white individual." In a similar vein, he makes recurring suggestions of a conspiracy on the part of the Committee, accusing member Reischel, for example, of concealing a letter, padding the record, and employing a "deceptive device" to tarnish Blair's credibility; accusing the Committee of "hid[ing]" member Speights' voluntary recusal from this court "because [it] would fly in the face of the Committee's claim against Mr. Blair that the motion to recuse her was improper"; and accusing the Committee of having "conjured up" findings, of dishonesty with this court and of "unleash[ing] its wrath" on him. As in *Demos, supra,* these intemperate broadsides, unsup-

---

5. Member Reischel, who was counsel to the Committee at the time, *see* D.C.App.R. 46(a), is employed by the Office of the Corporation Counsel.

6. What the judge did do was deny Mr. Reischel's request to call another witness regarding the letter.

7. As the Committee pointed out, Blair had particular notice that the recusal motion would be a subject for discussion. *See* Supp.R., Doc. 5(4),

Motion to Strike Applicant's Motion to Recuse and/or Disqualify at 2 ("Blair should be aware that his conduct in filing this motion may be weighed in assessing his fitness for admission to the Bar of this jurisdiction.").

8. The Committee was not obliged to hear Blair's proposed expert testify that, despite the highly personalized and insulting language of the recusal motion, it was meritorious—an issue the Committee could decide for itself.

ported by evidence, make us profoundly doubtful of Blair's fitness to engage in the practice of law.

 Seventh, Blair points to what he calls "Committee Counsel's [Reischel's] prosecutorial and hostile conduct throughout these proceedings." Blair is correct that Reischel assumed an adversary role in the remand and hearings because of (in Reischel's words) the "complicated nature" of the case and the advantage to the Committee of having "an adversary development of the case." But precisely for this reason, Reischel did not participate in the Committee's deliberations and vote or in the drafting of the findings and recommendation. In these circumstances, Blair can point to no way in which Reischel's role somehow tainted the Committee's recommendation to us.[9]

Eighth, Blair argues that the Committee's conclusion that he had not proven by a preponderance of the evidence that he did not engage in improper fee-splitting in the mid–1980's is flawed in that division of fees with non-lawyers is no longer prohibited.[10] Notwithstanding recent changes in our ethics rules, fee-splitting was unethical at the time of Blair's conduct. *See* DR 3–102. Moreover, the Committee was concerned not so much with whether Blair had engaged in fee-splitting as it was with his lack of candor in explaining his income during the relevant period.

\* \* \*

We agree with the Committee that Blair's past conduct as a litigator in West Virginia (and most likely any fee-splitting he engaged in in 1985–86) would not prevent his admission if he had been able to demonstrate a substantial change in character and in his recognition of his ethical responsibilities. Blair failed to do that. Despite his assertion that he has been forthright with the Committee in these proceedings, his filings with the Committee have exhibited a serious lack of candor. He has refused to accept responsi-

bility for his conduct and shifted the focus at each opportunity to an asserted bias against him lurking in the Committee's proceedings and recommendation. In this sense his conduct parallels that of the applicant in *Demos, supra,* whom we denied admission substantially for those reasons. On the whole, Blair has failed to exhibit the "qualities of truth-speaking, of a high sense of honor, or granite discretion, ... that have ... been compendiously described as [the] 'moral character' necessary for the practice of law." *Demos,* 579 A.2d at 674 (internal quotations and citation omitted). Blair has not carried his burden of persuading us that he is fit for admission to the Bar.

*So ordered.*

---

**9.** Reischel's role here is not unlike instances where the Committee conducts independent investigations on applicants who have committed serious crimes in the past, *see Manville,* 494 A.2d at 1294, a role that can quickly acquire "prosecutive" characteristics.

**10.** See Rule 5.4(a)(4), RULES OF PROFESSIONAL CONDUCT (1995).